THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR21-189-JLR |
| Plaintiff, | ) | |
| v. | ) | BRYAN SPARKS'S SENTENCING MEMORANDUM |
| BRYAN ALAN SPARKS, | ) | |
| Defendant. | ) | |

Bryan Sparks is a smart, quick-witted, and capable man. If you spend any amount of time with him, he is sure to make you laugh—usually at his own expense. Bryan has a hard time seeing his positive qualities because he has internalized the message he received from his father at birth: that he is "a worthless piece of shit." He has chosen tattoos that reiterate his negative self-perception. One such tattoo is "Mama Tried"—a reference to a Merle Haggard song. Like the protagonist of the song, Bryan's father left his mother with "a heavy load": to raise children he did not want while he gallivanted around the world, having affairs and possibly committing crimes. Just as the protagonist of the song, Bryan turned 21 in prison. Although he chose this reference, in part, to honor his mother, he also believes that "only [h]e [is] to blame" for his lot in life.[1]

---

[1] The refrain of "Mama Tried" is as follows:
And I turned twenty-one in prison doin' life without parole
No one could steer me right but Mama tried, Mama tried

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

1   Bryan will be the first to say that he has made poor and harmful decisions—most

2   recently his choice to use other people's identities to obtain government benefits. But

3   he is not to blame for many of the traumas he endured during his childhood or the fact

4   that he has a severe substance use disorder co-occurring with major depressive disorder,

5   post-traumatic stress disorder, and avoidant personality disorder. The latter three

6   disorders are only recently diagnosed. Ex. 1, Salusky Report, at 9.

7   In 2020, Bryan was using so heavily that his world revolved around finding

8   drugs and using drugs. When the government implemented pandemic relief programs

9   without many security measures in place, he suddenly had the ability to get money in

10  amounts he had only dreamed of before. Like an alcoholic at an open bar, Bryan took

11  advantage, and he spiraled out of control; he and Ms. Luna were spending

12  approximately $21,000/month on drugs. He could not see the harm he was causing

13  others because he was submitting fraudulent claims as compulsively as he was using

14  drugs. When he was arrested in Colusa County, California, he was relieved because he

15  could not stop on his own.

16  Two years after Bryan's arrest, he is in a different place. He deeply regrets that

17  he used other people's identities—including friends' identities—to submit false claims

18  for government benefits during the pandemic. Ex. 2, Sparks Ltr. Thanks to the

19  medication-assisted treatment program in the D.C. Jail, he is sober. He has been

20  evaluated by Shepard Salusky, a mental health professional, who has given him

21  diagnoses and treatment recommendations to address his mental health needs and

22  substance use disorder. Ex. 1, Salusky Report, at 10. As Dr. Salusky suggests, Bryan

23  needs acceptance, not rejection.

24

25

26  Mama tried to raise me better, but her pleading, I denied
    That leaves only me to blame 'cause Mama tried

BRYAN SPARKS'S SENTENCING
MEMORANDUM
(*U.S. v. Sparks*, CR21-189-JLR) - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

The good news is that when he is sober, stable, and has a sense of self-worth, he is incredibly capable. During the last period he was on probation, the structure served him well: he had a stable place to stay, was sober, and earned straight A's in college. With the help of counselors attuned to the myriad and complex psychological issues he has, an accepting community, and a challenging job, Mr. Sparks can succeed. He needs acceptance, not rejection.

Prison is not the best environment to address Bryan's complex issues and needs; supervision in the community is far more effective. This Court should impose a sentence of 60 months' imprisonment with five years of supervised release. A longer period in custody is greater than necessary to achieve the objectives of punishment—retribution, deterrence, incapacitation, and rehabilitation. *See* 18 U.S.C. § 3553(a).

# I.    BRYAN SPARKS'S PERSONAL HISTORY

When Bryan Sparks heard that his co-defendant and ex-girlfriend had told the agents that "he wanted everyone to be happy," and so "people used the hell out of him for everything," he quipped, "I'm just a sucker with no self-esteem"—reference to "Self Esteem," a song by The Offspring that was incredibly popular in the late 1990's. His response highlights both Bryan's potential—his quick wit and intelligence—and also what holds him back—his terribly low self-esteem.

Bryan Sparks believes he is a loser. He was taught to believe that at a young age and has been trying to avoid confronting the source of his low self-esteem ever since by using drugs, compulsively seeking things that make him feel good, and searching for acceptance.

## A.    Unwanted at Birth

When Herbert Sparks learned that his wife Mary Ruth was expecting their second child, he was angry. He told Mary Ruth that he did not want to have kids; he wanted to take care of only himself. Herbert's attitude did not change after Bryan was

BRYAN SPARKS'S SENTENCING
MEMORANDUM
(*U.S. v. Sparks*, CR21-189-JLR) - 3

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

born. He routinely beat Bryan with anything he could find—pool cues, ping pong paddles, and belts. Herbert called his only son "a worthless piece of shit."

Although Herbert and Mary Ruth presented as a married couple to others, Herbert took off for weeks and months at a time. While away, he may or may not have had affairs and committed crimes. Mary Ruth understandably suffered from depression. She likely knew her husband was a womanizer and alcoholic, but she remained in the relationship because she had few marketable skills. After a car accident, Mary Ruth was prescribed opiates, which she abused the rest of her life.

There wasn't much love for Bryan at home. He sought out love and acceptance elsewhere. At first, Bryan found meaning and acceptance in the skateboarding community. But he quickly turned to substances to avoid engaging with the lack of love at home. At age 15, he found in a friend's mother what he thought was love and acceptance. She initiated a sexual relationship with Bryan and introduced him to methamphetamine. Although Mary Ruth reported the sexual abuse to the police, there was never an investigation or prosecution of the woman. Bryan has struggled with the drugs ever since.

**B.      "Mama Tried"—Paradise Cove**

By the time Bryan was 16 years old, he had run away from home and was severely addicted to methamphetamine and heroin. After he was arrested in Fort Worth at age 16, his parents decided to enroll him in Paradise Cove, a "school" in American Samoa. Bryan was abducted in the middle of the night and taken to Utah for an evaluation and then eventually shipped to Paradise Cove.

The conditions at Paradise Cove were atrocious, and the abuse Bryan and other children suffered there has had a lasting impact. Jeremy Nicholas, one of Bryan's friends from that time, explained that, had the defense team contacted him a few years

BRYAN SPARKS'S SENTENCING
MEMORANDUM
(*U.S. v. Sparks*, CR21-189-JLR) - 4

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

ago, he would not be able to talk about his experiences there; they were so horrible. He has now had a chance to process that traumatic experience at Paradise Cove.

The school was in a cove down the hill from a pig farm. The runoff consisting of pig's excrement and urine flowed into the camp, which caused the children to have rashes, boils, and scabies.[2] One survivor of Paradise Cove told a reporter for Dateline that the place "looked like a Nazi death camp."[3] The students were fed milk rice. On weekends they could have a peanut butter and jelly sandwich. As a result of this minimal diet, children were severely undernourished. Discipline at Paradise Cove was severe. Staff regularly beat the children and told them that they were worthless. Conditions at Paradise Cove were so severe that there were credible allegations of child abuse reported to the U.S. Department of State and investigated. Subsequent investigations by CBS 48 Hours and NBC Dateline led to the program's closure. *See* Ex. 3, Dep't of State Investigation Request.

The educational benefits of Paradise Cove were minimal. The kids were told to educate themselves by reading textbooks on their own under the strict supervision of the school authorities. Children were not allowed to talk without permission. They had to listen to the same tape repeatedly until they could pass a test about the contents of the tape. There were monthly "seminars," where staff screamed and yelled at the kids to make them cry. If the children did not shed "genuine tears," then staff would force the kids to repeat the "seminar."

The conditions in Paradise Cove were so miserable that Bryan devised a plan to escape. He thought he could swim around the cove because the hills were too difficult

---

[2] *See also* CBS 48 Hours at 10:23–10:40, available at https://www.youtube.com/watch?v=15JModA_-ok; David Kohn, CBS 48 Hours (Oct. 15, 1998), available at https://perma.cc/7QP4-2CTN.

[3] NBC Dateline, *Paradise Cove Samoa*, available at https://www.youtube.com/watch?v=aWln8JuzD38.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

to climb, the jungle was too thick, and the pig waste was too pervasive. Bryan believed he could be a stowaway on a ship returning to the mainland for supplies. He was quickly caught and returned to Paradise Cove, where he was forced to stay for two weeks in "The Box," a 4 x 4 x 8 plywood box without windows. He was allowed out once per day to use the bathroom.[4]

Bryan survived Paradise Cove and earned the equivalent of a high school diploma. But he left American Samoa with lasting trauma and a deep-seeded sense of worthlessness. Shortly after returning to the United States, he ran away from home again and started to use methamphetamine and heroin.

### C.    Prison Redux: No Opportunity for DREAM

Once Bryan began using drugs again, he quickly needed to find a way to pay for them. At 18 years old, he was arrested and convicted for burglary and theft and sentenced to jail or probation. Neither sentence provided a meaningful opportunity for treatment. Throughout Bryan's 20s, that story repeated itself. He was arrested for crimes committed to gain money for drugs and cycled in and out of prison without meaningful treatment. *See* PSR ¶¶ 51–56.

Nobody questioned the efficacy of these prison sentences. Nobody asked why Bryan relapsed very shortly after he was released from prison.

Part of the problem is that prison was not much different from Paradise Cove. Shon Hopwood, a well-respected law professor who spent over ten years in a federal prison, explains how prison negatively impacts a person's sense of self-worth:

> Prisons tend to rinse away the parts that make us human. . . . Our prisons also foster an environment that values dehumanization and cruelty. At the federal prison in which I served for more than a decade, I watched correctional officers handcuff and then kick a friend of mine who had a softball-sized hernia protruding from his stomach. Because he was asking

---

[4] 48 Hours filmed "The Box" during its investigation. *See* CBS 48 Hours at 7:48–9:12, available at https://perma.cc/GMW5-CWGS.

BRYAN SPARKS'S SENTENCING
MEMORANDUM
(*U.S. v. Sparks*, CR21-189-JLR) - 6

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

for medical attention, they treated him like a dog. There was little empathy in that place. And for over 10 years of my life, when those in authority addressed me, it was with the label "inmate." The message every day, both explicitly and implicitly, was that I was unworthy of respect and dignity. Such an environment leads people to have a diminished sense of self-worth and personal value, affecting a person's ability to empathize with others. The ability to empathize is a vital step towards rehabilitation, and when our prisons fail to rehabilitate, public safety ultimately suffers.[5]

Bryan already suffered with a poor sense of self-worth. Prison just reinforced what he had been taught by his father and the supervisors in Paradise Cove: he is "a worthless piece of shit."

Bryan was also cycling in and out of prison during a time when policymakers believed punishment could remedy substance use disorders. But doctors' understanding of substance abuse disorders has changed dramatically in the past ten years. Gone are the days when doctors treated such disorders as moral failings; instead, medical practitioners properly consider addiction a chronic illness.[6] Continual misuse of controlled substances alters and compromises brain function over time and can lead to relapse. The changes in the brain persist long after substance use stops.[7]

Because substance abuse disorder is a complex disease, the National Institute on Drug Abuse ("NIDA") has made clear that one guiding principle of evidence-based treatment is that "[n]o single treatment is appropriate for everyone."[8] And, because

---

[5] Shon Hopwood, *How Atrocious Prison Conditions Make Us All Less Safe*, Brennan Center for Justice (Aug. 9, 2021), available at https://perma.cc/PZ26-EZU8.

[6] U.S. Dep't of Health & Human Servs., *Facing Addiction in America: The Surgeon General's Report on Alcohol, Drugs, and Health* 2-1 (2016), available at https://perma.cc/4PQU-9VGS.

[7] *Id.* at 2-2.

[8] *Id.* at 4-14.

BRYAN SPARKS'S SENTENCING
MEMORANDUM
(*U.S. v. Sparks*, CR21-189-JLR) - 7

addiction is a chronic disease, NIDA counsels that relapses are bound to happen during the treatment process.[9] Indeed, "[m]ore than 60 percent of people treated for a substance abuse disorder experience relapse within the first year after they are discharged from treatment, and a person can remain at increased risk of relapse for many years."[10] When a patient relapses, instead of punishing the patient for relapse, treatment providers must view the relapse as a sign that treatment must be "reinstated or adjusted or that another treatment method should be tried."[11] Nearly every evidence-based treatment program acknowledges that the combination of treatment medications "with behavioral therapy is the best way to ensure success for most patients."[12]

Unfortunately for Bryan, his relapse to drug use and stealing to sustain the disorder was always seen as cause to incarcerate rather than an opportunity for treatment. While in his 20s, Bryan never had a chance to participate in the kind of intensive program, like the DREAM Program in this district, where he would be accountable to probation officers and the court on a regular basis.

### D.     A Different Approach

For 15 years, Bryan cycled in and out of prison until the Long Beach Superior Court decided to give him a chance to try treatment—a response to the behavior that proved to be far more effective. At the age of 32, Bryan started his first and only try at a residential drug and alcohol program through the Salvation Army. He also found a group of supportive, compassionate people at Alcoholics Anonymous.

---

[9] *Id.*

[10] *Id.* at 2-2.

[11] Nat'l Inst. on Drug Abuse, *Drugs, Brains, and Behavior: The Science of Addiction* 26 (July 2014).

[12] *Id.*

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Bryan enjoyed the structure probation offered and thrived. He had to check in regularly with a probation officer, who held him accountable. Because Bryan was sober and stable, he managed to find work and an apartment of his own—something that felt impossible for decades. He also enrolled in Los Angeles Community College, where he earned straight As, including in particularly demanding classes, such as C++ Programming. Ex. 4, LACC Transcript. Bryan succeeded because he was intellectually engaged and felt good about himself and what he was doing.

### E.   Mama Liked the Roses[13]

At the beginning of 2016, Bryan was thriving. He was enrolled in classes that would assist in a career as a programmer. In March, however, his mother died unexpectedly due to liver failure. Around that same time, one of his former significant others died due to complications of HIV/AIDS.

Overcome with grief, Bryan made a series of radical changes in a short period of time. He did not finish his courses and never returned to school. He moved to Eugene, Oregon, because he needed a change of scenery and started working in a lumber mill.

When Bryan went to the mountains to spread his mother's ashes on Mount Hood in a field of wildflowers, he decided to contact his father who had been living in the Dominican Republic. They had not spoken in over a decade. Although Bryan had spent most of his life hating his father, his mother's death made him feel more alone and he was grateful for the connection to his father even if it came at some emotional cost.

### F.   One Step Forward and Two Steps Back

The American Society of Addiction Medicine notes that addiction manifests during times of trauma or stress that overwhelm a person's coping abilities. Disruption

---

[13] By Elvis Presley.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

of healthy relationships, support networks, and sense of self also cause drug use or relapse.[14] That proved true for Bryan.

Avoidant as always, Bryan returned to drug use to numb his grief and changed cities and jobs frequently. As before, he could not control his compulsive behavior. After Eugene, Bryan moved to Denver and then to Washington, where his friend from Paradise Cove, Jeremy Nichols, was living. Bryan knew nobody else in the state.

While living with Mr. Nichols, Bryan was more or less sober, but ultimately left because he knew that he could not use drugs around his friend. He found an apartment in the International District and searched for drugs and companionship by contacting Autumn Luna on an escort website. He figured that she might know where to buy drugs. As Ms. Luna explained, when she and Bryan first met and established that they both were using, they talked for the whole hour. The two saw each other on and off for a while and talked and used together until Bryan got a job on a fishing boat in Alaska.

When Bryan returned from Alaska, he had a sizeable sum of money. Unfortunately, he had become preoccupied with substance use and spent that money quickly and became transient and singularly focused on avoiding the physical and emotional side effects of withdrawal. Ms. Luna was similarly unstable, and the two reconnected and resumed their friendship. Bryan supported himself engaging in odd jobs and committing small frauds that would net $100-$200.

## G.     A Once in a Lifetime Pandemic Creates a Once in a Lifetime Opportunity

In 2020, when the COVID-19 pandemic disrupted the work force and the economy, Congress hastily implemented various programs to allow people to apply for unemployment benefits and business loans. These well-intentioned programs gave

---

[14] Ex. 5, Am. Soc'y of Addiction Medicine, *Public Policy Statement: Definition of Addiction* 2 (2011).

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

people access to large sums of money with unfortunately few security measures in place. Word of how easy applying and receiving benefits was traveled quickly by word of mouth and online forums. People raced to get these funds just as passersby would swarm an overturned and open armored bank car to get cash. This was a crime of opportunity.

Bryan was one of those people. He was so deep into his addiction, that his preoccupation with substance use caused him to justify and overlook the harm this fraud caused the people whose identities he used to apply for small business loans and unemployment. Bryan is a compulsive person. He struggles with binging on food, alcohol, drugs, or anything else that offers short-term rewards, such as submitting fraudulent claims. He submitted claims as compulsively as he was using.

Bryan taught Ms. Luna how to apply for and receive these loans and benefits, as well. Suddenly, the two had access to cash in quantities they could hardly believe, which in turn granted them access to a nearly unlimited supply of drugs. Bryan knew he was out of control. When Colusa County police searched his car, they found a notebook where he had started keeping track of their daily spending:



Bryan was somewhat relieved when he was arrested because he was incapable of stopping drug use on his own, which is consistent with the definition of addiction: the

"inability to consistently abstain, impairment in behavioral control, craving, diminished recognition of significant problems with one's behavior and interpersonal relationships, and a dysfunctional emotional response."[15] In fact, even after his arrest, Bryan could not stop until he was arrested a second time in Washington, D.C., on his way to visit his father in Miami. He expected his father to be there receiving treatment for cancer. He has been in custody ever since.

## II.     THE GUIDELINES

The Guidelines recommend a sentence between 92–115 months. The government and Probation recommend a sentence in the middle of that range. There are many reasons, however, not to use the Guidelines as a starting point for determining what sentence is sufficient but no greater than necessary to achieve the objectives of punishment for Bryan Sparks's conduct.

The fraud Guidelines have been flawed from the start. Before the Sentencing Commission promulgated the Guidelines, it looked at sentences from 1983–85. As Mark Osler and Judge Mark W. Bennett explain:

> Even though the Sentencing Commission farmed this data, it immediately, and arbitrarily, without explanation then or now, jettisoned the nearly 50% of federal sentences where a defendant was given probation—thus hijacking realistic data from prior federal sentencing practices. To make matters worse, the Sentencing Commission abandoned the empirical approach of prior sentences, even with the skewed data of eliminating cases with probation, for a new, significantly harsher approach.[16]

---

[15] Ex. 5, ASAM Public Policy Statement at 1.

[16] Mark Osler, Judge Mark W. Bennett, *A "Holocaust in Slow Motion?" America's Mass Incarceration and the Role of Discretion*, 7 DePaul J. for Soc. Just. 117, 140–41 (2014) (footnotes omitted).

As a result, all sentences—but particularly fraud sentences—increased dramatically after the passage of the Sentencing Reform Act.[17] Over the years, the harsh critique of the fraud Guidelines by judges and scholars has been relentless.[18] These criticisms have manifested in practice; only 37.1% of sentences for government-benefit fraud were within the Guidelines range in fiscal year 2021.[19]

Among the criticisms are that the focus on loss overstates culpability in many cases.[20] Critics of the Guideline emphasize that, like drug quantities, the loss amounts fail to distinguish between the least and most culpable people.[21] In response to these criticisms, the American Bar Association proposed amending the loss table to remedy the harshness of § 2B1.1.[22] Under that proposal, in this case, eight levels (instead of 18)

[17] *See generally* Mark W. Bennett, Justin D. Levinson, Koichi Hioki, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 952–53 (2017); Ex. 6, Bowman, Frank O., *Damp Squib: The Disappointing Denouement of the Sentencing Commission's Economic Crime Project (and What They Should Do Now)*, 27 Fed. Sent'g Rptr. 270–83 (2015).

[18] *Bennett, et. al.*, *supra*, at 973–75 (collecting opinions calling the fraud guidelines "absurd on their face," "of no help," "fundamentally flawed," "valueless," and "more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology").

[19] U.S. Sent'g Comm'n, *Quick Facts: Government Benefits Fraud Offenses* (Aug. 2022), available at https://perma.cc/J2DU-TQPP.

[20] *Bennett, et. al.*, *supra*, at 977–78 (public comment of the Federal Defender community); *id.* at 982–84 (proposing a "buzz cut" to the loss table).

[21] *See* David Debold & Matthew Benjamin, *"Losing Ground" in Search of A Remedy for the Overemphasis on Loss and Other Culpability Factors in the Sentencing Guidelines for Fraud and Theft*, 160 U. Pa. L. Rev. PENNumbra 141, 151–52 (2011).

[22] Ex. 7, Am. Bar Ass'n, *A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes* (Nov. 10, 2014).

BRYAN SPARKS'S SENTENCING MEMORANDUM
(*U.S. v. Sparks*, CR21-189-JLR) - 13

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

would be added for loss between $1 million and $5 million dollars. If all other enhancements remain, then the Guidelines range would be 41–51 months (OL 16/CHC V).

Critics also focus on two specific Guidelines provisions that routinely inflate the Guidelines: the number of victims and the "sophisticated means" enhancement. Judge Bennett noted that, "the number of victims has assumed too much importance under the guidelines and that loss often correlates with the number of victims."[23] The "sophisticated means" enhancement also often results in redundancy and unduly increases the offense level because "it applies in virtually every case where the loss is moderate or high and is also often applied even in the simplest of fraud schemes."[24] If only these specific offense level increases are removed, then the Guidelines range would be 63–78 (OL 20/CHC V).

This Court can and should decline to find that the Guidelines recommend a reasonable starting point in this case.

### III.   A 5-Year Sentence is Sufficient Punishment, and More Time in Prison is Greater Than Necessary

The Probation Department and the government recommend that the Court imprison Mr. Sparks for eight years and four months (100 months). That sentence would be greater than necessary to achieve the objectives of punishment: retribution, deterrence, incapacitation, and rehabilitation. Section 3553(a)'s requirement that courts impose a sentence no greater than necessary to achieve these goals demands evidence that the chosen form of punishment—often prison—is necessary to accomplish these objectives. Rigorous scientific research consistently shows that lengthy terms of imprisonment do

---

[23] Mark W. Bennett, *et al.*, *supra*, at 987.

[24] *Id.* at 988.

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

not deter or prevent crime—particularly when the conduct is the result of a mental health and substance use disorders.

Mr. Sparks's fraudulent activity was the product of a severe substance use disorder that goes hand-in-hand with untreated mental health symptoms. As the United Nations Office on Drugs and Crime and World Health Organization have noted, these types of compulsive economic offenses are committed to finance drug use and avoid the crippling experience of withdrawal.[25] Opiate use disorders frequently drive income-generating offenses.[26] Consistent with international research, both organizations unequivocally state that drug dependence is "a complex, multifactorial brain disease" that "should be seen as health-care conditions and should be treated in the health-care system," not prison.[27]

For Mr. Sparks, the most critical issue is addressing his severe substance use disorder, which in turn requires addressing his other mental health needs in a supportive environment. While 18 U.S.C. § 3553(a) requires this Court to consider Mr. Sparks's need for training and medical care, 18 U.S.C. § 3582 admonishes that "imprisonment is not an appropriate means of promoting correction and rehabilitation." *United States v. Tapia*, 564 U.S. 319, 327, 330, 335 (2011). Mr. Sparks's past shows that he can live a crime-free, productive life when he is sober and engaged in meaningful employment. Thus, addressing his mental health needs and substance use protects the public and discourages criminal conduct far more effectively than prison.

A five-year (60 month) sentence is sufficient punishment in light of 18 U.S.C. § 3553(a)'s objectives. A five-year term of supervised release with treatment in the

---

[25] United Nations Office on Drugs & Crime, World Health Organization, *Treatment and Care for People with Drug Use Disorders in Contact with the Criminal Justice System: Alternatives to Conviction or Punishment* 8–9 (2021), available at https://perma.cc/TP3H-DQJ4.

[26] *Id.* at 9.

[27] *Id.* at 9–14.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

community is the most effective means to encourage Mr. Sparks to return to the community as a productive citizen. Five years' imprisonment will reflect the seriousness of the offense and acknowledge the harm to others without creating disparities.

### A.      Deterrence and Incapacitation Do Not Justify a 100-Month Sentence

General deterrence "occurs when the decision maker contemplates the punishment experiences of others."[28] Consequently, general deterrence "does not concern a 'connection' between behavior and consequences, but whether potential consequences already recognized by the decision maker seem sufficiently 'costly' to deter behavior."[29] Prison is unnecessary to incapacitate people when a person is already deterred from committing crimes and has the tools to succeed without resorting to crime.

The "conforming influence" of extralegal consequences attendant to indictment and prosecution—shame, fear of peer disapproval, embarrassment, and social stigma—are far more effective than punishment in fostering general deterrence.[30] Even the Department of Justice recognizes that "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment."[31]  What this means is that the real fear of being caught, the shame of admitting guilt, and the social stigma of prosecution, are all the

---

[28] Daniel S. Nagin & Greg Pogarsy, *Integrating Celerity, Impulsivity, an Extralegal Sanction Threats into a Model of General Deterrence*, 39(4) CRIMINOLOGY, 865, 867 (2001).

[29] *Id.*

[30] *Id.* at 869.

[31] Nat'l Institute of Justice, *Five Things About Deterrence* (Jun. 5, 2016), available at https://perma.cc/4QAL-QPY7.

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

preventative aspects of deterrence—*not* what happens to a stranger who is caught and subsequently punished.[32]

Research consistently proves that lengthy prison sentences do not deter future crime and may even have the opposite effect. The University of Chicago published a meta-analysis of the deterrent effect of custodial sentences.[33] The study's authors reviewed 116 reports and found that "custodial sanctions have no effect on reoffending or slightly increase it when compared with the effects of noncustodial sanctions such as probation. . . . Incarceration cannot be justified on the grounds it affords public safety by decreasing recidivism." *Id.* at 353. Indeed, if lengthy terms of incarceration improved public safety, then the United States should be the safest country in the world, but it is not. The United States incarcerates a greater percentage of its population than any other nation, including countries that have similar or higher rates of crime.[34] The high cost of incarcerating people for lengthy periods of time has not had a demonstrable benefit to public safety.

Neither deterrence nor incapacitation justify a 100-month prison sentence for Mr. Sparks. His personal history illustrates the point that imprisonment does not prevent drug use or criminal behavior. In the past, after lengthy periods of imprisonment, Mr. Sparks promptly relapsed when he returned to the community until he was given the opportunity to participate in drug treatment instead of going to prison. And treatment worked; he was sober and did not commit crimes for more than five

---

[32] Valerie Wright, Ph.D, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, The Sentencing Project (Nov. 2010).

[33] *See* Petrich, et al., *Custodial Sanctions and Reoffending: A Meta-Analytic Review*, 50 Crime & Justice 353 (Sept. 22, 2021), available at https://perma.cc/J7N2-9GTM.

[34] Ex. 8, Emily Widra, *States of Incarceration: The Global Context 2021*, available at https://perma.cc/WQJ5-2S6J.

BRYAN SPARKS'S SENTENCING
MEMORANDUM
(*U.S. v. Sparks*, CR21-189-JLR) - 17

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

years. His relapse after the death of his mother and former romantic partner does not mean that treatment was ineffective in the past or will be ineffective in the future.

### B.  Prison Does Not Rehabilitate

While 18 U.S.C. § 3553(a) encourages this Court to consider the most effective manner to provide a defendant with necessary training and medical care, 18 U.S.C. § 3582 also admonishes, "imprisonment is not an appropriate means of promoting correction and rehabilitation." *Tapia*, 564 U.S. at 327, 330, 335. Lengthy terms of imprisonment undermine rather than advance the goals of rehabilitation. Research shows that imprisonment has either no effect or makes reoffending outcomes worse when compared with noncustodial sanctions such as probation, electronic monitoring, or otherwise."[35]

Mr. Sparks's education and treatment needs are best addressed in a community setting with supportive, comprehensive counseling. He is also an incredibly bright man who would benefit from completing his college degree. He has already shown that he is able to succeed. He just needs the right tools and accountability to do so.

Despite the Bureau of Prison's lengthy brochure that touts programs galore, the reality is quite different.[36] Opportunity for meaningful education in the BOP is limited—particularly recently during staff shortages and lockdowns. Although Mr. Sparks may have the opportunity to participate in some programs and have a job, the opportunities will be significantly greater in the community with the assistance of the Probation Department.

---

[35] *See* Petrich, et al., *supra*, at 399; *see also id.* at 401 ("Consensus that custodial sanctions, overall, do not reduce reoffending is universal.").

[36] *See generally* Justin George, *What Are Inmates Learning in Prison?: Not Much.*, The Marshall Project (May 31, 2017), available at https://perma.cc/BH3W-FRVS.

Nonetheless, it is imperative that Mr. Sparks receive some treatment while in custody. While in the D.C. Jail, Mr. Sparks was able to participate in the Medication Assisted Treatment (MAT) Program to assist with his opiate use disorder. Although he weaned himself off methadone because he feared going through withdrawal while in transit to SeaTac, Mr. Sparks will benefit from resuming the MAT Program, which will minimize the risk of overdose after his release. Given that Dr. Salusky recently diagnosed Mr. Sparks with severe opioid use disorder, Ex. 1, Salusky Report at 9, he should qualify for the program under the BOP's guidelines.[37] This Court's recommendation should prompt prison staff to make the appropriate referral to medical staff.

This Court should also recommend that he participate in the Residential Drug and Alcohol Program, which has a track record of reducing recidivism rates for people who, like Mr. Sparks, have substance use disorders. The U.S. Sentencing Commission recently found that those who participated in RDAP and the Non-Residential Drug Abuse Program were rearrested at a lower rate than those who did not participate in these programs.[38] A lengthy custodial sentence is not appropriate to facilitate Mr. Sparks's access to either treatment programs, *Tapia*, 564 U.S. at 327, 330, 335, but this Court's recommendation will help his placement in an appropriate facility.

Mr. Sparks's long-term success will depend more on the services he receives in the community than his time in prison. He will need a therapist who can address past traumas in a supportive environment, as well as substance use treatment—probably

---

[37] Fed. Bureau of Prisons, *Opioid Use Disorder: Diagnosis, Evaluation, and Treatment Clinical Guidance* 3–5 (Aug. 2021), available at https://perma.cc/9Z3E-MCMB.

[38] *See generally* U.S. Sent'g Comm'n, *Recidivism and Federal Bureau of Prisons Programs: Drug Program Participants Released in 2010* (2022), https://perma.cc/7K59-4RQ4.

BRYAN SPARKS'S SENTENCING
MEMORANDUM
(*U.S. v. Sparks*, CR21-189-JLR) - 19

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

medication assisted treatment. Regular meeting with a probation officer and urine screens helped Mr. Sparks stay on track in the past. When he reviewed the proposed conditions of supervision with counsel, he remarked that frequent testing would probably be good for him.

More than anything, Mr. Sparks needs someone who believes in him.

## C.  A Sentence Longer Than Five Years Creates Disparities and Undermines Respect for Law

A 100-month sentence cannot be justified for the purpose of deterrence, incapacitation, or rehabilitation. What remains of the penological purposes of a sentence is to exact retribution. "Punitive custodial conditions cannot be justified on crime-savings grounds."[39] The question then becomes how much suffering does Bryan Sparks deserve for his crimes?

A sentence of 60 months is consistent with national and local trends for similar conduct and avoids the absurdity of punishing Mr. Sparks more severely than defendants who engaged in more serious, predatory, and harmful criminal conduct. Even though many people convicted of fraud do not have prior criminal convictions, they often had advantages Mr. Sparks did not. Many were not sexually abused and dependent on methamphetamine and heroin at age 15. Nor were they subjected to child abuse on an island far from home. Sentencing Mr. Sparks to a term of imprisonment in the same range as people who committed multi-million-dollar frauds or targeted elderly, vulnerable people exaggerates the seriousness of his offense and perpetuates the perception that the criminal legal system does not treat impoverished and rich people similarly.

A 100-month sentence is far above national averages for similar conduct. Sentences for government-benefit fraud are consistently below the Guidelines range, and

---

[39] *See* Petrich, et al., *supra*, at 399; *see also id.* at 402.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

the average sentence is 13 months—well below 60 months.[40] When courts account for aggravated identity theft, the average *total* sentence imposed for aggravated identity theft in addition to another offense was 50 months.[41] In this district, the average sentences are even lower. The mean sentence for fraud in fiscal year 2022 was 19 months, and the median sentence was 15 months.[42]

Even when factoring in Mr. Sparks's criminal history, a 60-month sentence aligns with national averages. According to the U.S. Sentencing Commission's Interactive Data Analyzer, the mean length of imprisonment for people in Criminal History Category V sentenced for fraud was 52 months. The median length of imprisonment for people in this same group was 29 months.

In factually similar cases, the sentences imposed for fraud related to pandemic benefits is closer to 60 months' imprisonment than the government's and the probation department's recommended 100-month sentence:

- ***United States v. Phillip Augustin*, No. 21-cr-000805 (N.D. Ohio):** Mr. Augustin helped submit numerous applications for Paycheck Protection Program ("PPP") loans totaling over $15 million. He actually received approximately $5.9 million as a result of the fraud. Mr. Augustin received a sentence of 58 months' imprisonment. Dkt. 81, Judgment, PgID 749. His co-defendants received sentences ranging from 2 to 51 months' imprisonment. Dkt. 75, Gov't Sent'g Mem., PgID 647.

- ***United States v. Joseph Cartlidge*, No. 20-cr-00340 (M.D.N.C.):** Mr. Cartlidge submitted fraudulent PPP loan applications totaling over $2.3 million. He received a sentence of 78 months' imprisonment. Dkt.

---

[40] U.S. Sent'g Comm'n, *Quick Facts: Government Benefits Fraud Offenses* (Aug. 2022), available at https://perma.cc/J2DU-TQPP.

[41] U.S. Sent'g Comm'n, Quick Facts: Section 1028A Aggravated Identity Theft Offenses (July 2022), available at https://perma.cc/6BXR-7YW3.

[42] Ex. 9, U.S. Sent'g Comm'n, *Statistical Information Packet Fiscal Year 2022 Western District of Washington* 11, Table 7.

BRYAN SPARKS'S SENTENCING MEMORANDUM
(*U.S. v. Sparks*, CR21-189-JLR) - 21

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

164, Am. Judgment, at 2. Co-defendants David Redfern and Eric McMiller received sentences of 60 and 66 months respectively.

- ***United States v. David Hines*, No. 21-20011 (S.D. Fla.):** Mr. Hines received a 78-month sentence for submitting fraudulent PPP loans resulting in a loss of $3.9 million.

- ***United States v. Derek Acree*, No. 22-cr-80157 (S.D. Fla.):** Mr. Acree obtained over $1.26 million in fraudulent PPP loans. He was sentenced to 41 months' imprisonment.

- ***United Stats v. Garnell Tubbs*, No. 20-00193 (E.D. Ark.):** Mr. Tubbs received a 41-month term of imprisonment for submitting two PPP loan applications that resulted in a $1.9 million loss. Dkt. 24, Judgment; Dkt. 20, Plea Agreement, at 5–9 (factual basis).

- ***United Stats v. Polzin*, No. 21-cr-00264 (D. Ariz.):** Mr. Polzin submitted multiple fraudulent PPP loan applications and received over $2.2 million, which he spent on luxury items. The intended loss exceeded that sum. Mr. Polzin also engaged in money laundering. He received a sentence of 48 months' imprisonment. Although he had no criminal history category, other than a steroid dependence, Mr. Polzin did not identify any mitigating factors. Dkt. 71, Judgment; Dkt. 63, Gov't Sent'g Mem.; Dkt. 61, Def. Sent'g Mem., at 2.

Sentences at or near 100 months have been imposed primarily in cases with far more egregious fraudulent conduct than Mr. Sparks's crimes:

- ***United States v. James Stote*, No. 21-cr-000805 (N.D. Ohio):** Mr. Stote was the leader of a scheme to submit fraudulent applications for PPP loans for which he received kickbacks. The intended loss was over $35.7 million. Mr. Stote had significant criminal history, which included convictions for numerous fraud offenses. His sentence was 120 months—just 20 months longer than the sentence the government recommends even though the Mr. Stote stole over $34 million more than Mr. Sparks.

- ***United States v. Elizabeth Holmes*, No. 18-cr-00258 (N.D. Cal.):** Ms. Holmes notoriously deceived millions of investors in Theranos, resulting in a loss of over $730.84 million. Dkt. 1643, Gov't Sent'g Mem., at 7–13. Ms. Holmes's deception also caused patients to receive inaccurate

blood results that suggested they had cancer or were experiencing problems with their pregnancies. *Id.*, at 13–18. After Ms. Holmes was convicted at a trial, the Court imposed a 135-month sentence, Dkt. 1716, Judgment, at 2, just 35 months longer than the sentence recommended for Mr. Sparks even though the financial loss and emotional harm he caused pales in comparison to that caused by Ms. Holmes.

- ***United States v. Jennifer Shah*, No. 19-cr-00833 (SDNY):** Ms. Shah is one of the stars of The Real Housewives of Salt Lake City, a popular reality television show. She and her co-conspirators targeted elderly and vulnerable people for nearly a decade, selling them so-called business services. The total restitution owed is over $6.6 million. She attempted to obstruct the FTC's investigation into her companies by instructing others to lie. She lived a lavish lifestyle with the proceeds of the fraud, wearing designer clothes and living in a multi-million-dollar ski chalet in Park City. On national television, Ms. Shah proclaimed her innocence on national television, asserting that "the only thing I'm guilty of is being Shah-mazing!" She sold merchandise to profit from her prosecution. Ms. Shah received a 78-month sentence. Her co-defendants received sentences ranging from time served to 87 months' imprisonment. Nobody received a sentence of 100 months or more. Dkt. 646, Gov't Sent'g Mem., at 2–15 (offense conduct), 15–16 (co-conspirator sentences); Dkt. 670, Judgment.

A 60-month sentence is more consistent with sentences imposed for economic crimes motivated by a substance use disorder and limited to a limited period of opportunity, like Mr. Sparks's.

Finally, there is a stark disparity in this case. Ms. Luna has been accepted into the DREAM Program. If she succeeds, then she will walk away without a felony conviction or any prison time at all. Mr. Sparks is happy that she has the chance to participate in this program and avoid time in prison. Although Mr. Sparks acknowledges that he taught Ms. Luna how to submit the fraudulent claims, she also submitted fraudulent applications and used other people's personal identifying information to obtain these government benefits. Many of the qualities and characteristics that make her an excellent candidate for the program also make him someone in need of that chance. He was also severely addicted to drugs and homeless. He, too, experienced significant childhood trauma. Had Mr.

BRYAN SPARKS'S SENTENCING
MEMORANDUM
(*U.S. v. Sparks*, CR21-189-JLR) - 23

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

Sparks received the same opportunity at her age, then perhaps his current situation would be different. Mr. Sparks acknowledges that he is more culpable, but that fact and their age difference does not mean there should be such a staggering disparity between the outcomes.

## IV.   CONCLUSION

Mr. Sparks is a talented person with complex psychological needs. If given the confidence and tools to be productive, he can succeed. To achieve a sentence that is no greater than necessary to achieve the objectives of punishment—retribution, deterrence, incapacitation, and rehabilitation, this Court should impose the following sentence:

**Imprisonment:** 60 months' imprisonment (Count 11: 36 months; Count 15: 24 months consecutive to Count 11), which is concurrent to Mr. Sparks's anticipated sentence in Colusa County, California, Case No. CR62451-2. Mr. Sparks asks that this Court recommend that he participate in the Residential Drug and Alcohol Program and that he be designated to either FCI Sheridan (medium), FCI Englewood (low), or Terminal Island (low). This Court should strongly recommend that the BOP place him at a facility with a MAT Program and RDAP and that he participate in those programs.

**Supervised Release:** 5 years. Given Mr. Sparks's success on probation last time, this Court should opt for a longer period of supervision in lieu of incarceration. He has no objection to the recommended special conditions of supervision.

**Restitution:** Mr. Sparks and Ms. Luna should be jointly and severally liable for the restitution amount. They owe restitution to the U.S. Small Business Administration in the amount of $521,900, and the Washington Employment Security Department in the amount of $519,761, due immediately subject to the following special instruction:

> Other than the initial lump sum payment of $200, no other monetary penalties are due during the defendant's period of imprisonment. Payment begins when he begins supervised release in the amount of 10% of gross monthly income.

BRYAN SPARKS'S SENTENCING
MEMORANDUM
(*U.S. v. Sparks*, CR21-189-JLR) - 24

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

**Special Assessment:** $200 total ($100 for each count of conviction).

DATED this 16th day of May, 2023.

Respectfully submitted,

s/ *Colleen P. Fitzharris*
Assistant Federal Public Defender
Attorney for Bryan Alan Sparks

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**