**University of Missouri School of Law Scholarship Repository**

Faculty Publications

2015

# Damp Squib: The Disappointing Denouement of the Sentencing Commission's Economic Crime Project (and What They Should Do Now)

Frank O. Bowman III

Follow this and additional works at: https://scholarship.law.missouri.edu/facpubs

Part of the Law Commons

# Damp Squib: The Disappointing Denouement of the Sentencing Commission's Economic Crime Project (and What They Should Do Now)



**FRANK O. BOWMAN, III**

Floyd R. Gibson Missouri Endowed Professor of Law

University of Missouri School of Law

The consolidated fraud and theft guideline, U.S.S.G. § 2B1.1, has been a subject of sustained comment and critique since its adoption in 2001. Some of the critiques are technical and relate to issues such as the importance of "loss" in economic crime sentencing and the proper definition of concepts like "intended loss" and "sophisticated means." However, for the last decade or so, the dominant complaint has been that § 2B1.1 prescribes sentences that, particularly for many defendants in cases involving high loss amounts, are far too long.[1]

Therefore, when the Commission several years ago undertook a reexamination of economic crime sentencing,[2] one of the fundamental questions it faced was whether the charge of excessive severity was accurate, and if so, as to all economic criminals or only some. In her January 9, 2015, remarks accompanying the release of draft amendments to § 2B1.1, Judge Patti B. Saris, Chair of the Commission, observed that the Commission's study

> has led us to believe that the fraud guideline may not be fundamentally broken for most forms of fraud. [Economic crime] sentences on average *hew fairly closely to the guidelines for all but the highest dollar values, over $1 million in loss.* In our discussions with judges and a comprehensive survey several years ago, we learned that, while some judges are concerned about the fraud guideline, most are relatively satisfied with it for most types of fraud.[3]

In short, she seemed to say that, although the fraud guideline works fine for "most" cases, it does not work so well for cases with losses over $1 million.[4] This carefully modulated conclusion did not go down well among those who, like the ABA and some defense advocacy groups, feel that the guideline is fundamentally flawed, produces unduly high sentences for defendants across the loss spectrum, and needs to be completely rewritten.[5] Even so, given that eight of the sixteen steps on the loss table concern loss over $1 million, that there are more than 1400 cases annually with loss over $1 million, and that such cases constitute some 17 percent of the total number of fraud defendants sentenced each year,[6] the conclusion that § 2B1.1 does not work well for such cases is still a moderately big deal.

Accordingly, one would have expected the latest amendments to § 2B1.1 to concentrate on the class of high-loss offenders the Commission seemed to agree are overpunished by the guidelines. However, the amendments approved in April 2015[7]—though in several cases laudable for other reasons—will have little or no material impact on the guidelines ranges for very high-loss offenders, while producing modest guidelines reductions for some number of low-to-moderate-loss offenders.

In short, the Commission's ballyhooed multiyear study of the economic crime guideline seems to have fizzled.

That is unfortunate. While I agree with the Commission's basic conclusion that for many, perhaps most, economic offenders the guidelines do not suggest manifestly unreasonable sentences,[8] I also think that for high-loss defendants the fraud guideline is, in Judge Saris's phrase, "fundamentally broken." The Commission seems to believe that the latest amendments will at least ameliorate the high-loss offender problem. Unfortunately, the guidelines for high-loss offenders are *so* "fundamentally broken" that these tiny tweaks will have no meaningful effect.

Accordingly, the remarks that follow: (a) describe in some detail the historical roots and current causes of the high-end distortion of the fraud guidelines, (b) demonstrate that the 2015 amendments fail to solve or even materially ease the problem, and (c) make some concrete suggestions for bringing the guidelines for high-loss offenders into the sphere of practical utility.

In particular, I recommend that the Commission:

- Determine the maximum punishment that ought to be imposed for economic crime in any but the most extraordinary case, and modify § 2B1.1 so it generates sentences scaled downward from that maximum.
- Eliminate the top four levels of the loss table.
- Reduce the number, size, and cumulative impact of specific offense characteristics in § 2B1.1 by taking steps such as
  - placing a cap on the cumulative effect of the many specific offense characteristics in § 2B1.1,
  - reducing the number of offense levels assigned to some or all specific offense characteristics in § 2B1.1, and

*Federal Sentencing Reporter*, Vol. 27, No. 5, pp. 270–283, ISSN 1053-9867, electronic ISSN 1533-8363. © 2015 Vera Institute of Justice. All rights reserved. Please direct requests for permission to photocopy or reproduce article content through the University of California Press's Rights and Permissions website, http://www.ucpressjournals.com/reprintInfo.asp. DOI: 10.1525/fsr.2015.27.5.270.

   o eliminating the sophisticated means enhancement altogether.

## I. The Fraud Guideline, High-Loss Defendants, and Factor Creep

The unrealistically high sentences now prescribed by the guidelines for high-loss defendants are the result of four aspects of the evolution of § 2B1.1.

First, the original fraud and theft guidelines were designed to change the pre-guideline status quo, in which virtually all white collar criminals customarily received probation, to a new state of affairs in which significant white collar criminals were sentenced to prison. The original fraud guideline, U.S.S.G. § 2F1.1 (1987), accomplished this end by employing loss amount as the primary proxy for offense seriousness and calibrating a "loss table" so that defendants who caused modest-to-high losses (a minimum of $20,000 or higher if convicted at trial, or $100,000 or higher if convicted by plea) would have to spend at least some time in prison. Although the first fraud guideline did mandate prison for many defendants who would not previously have done time, it did not require very much time, even for the worst offenders. The base offense level (BOL) for a fraud conviction was then 6, and the highest loss accounted for by the original table was $5 million. Offenders who stole that much or more were subject to an offense level increase of only 11, producing a total offense level of 17 and a resultant sentencing range for a first-time offender of 24–30 months. Moreover, the original fraud guideline contained only one non-loss sentencing factor, an enhancement of 2 levels for more than minimal planning *or* multiple victims *or* a false claim to have acted on behalf of a charity *or* violation of a judicial order. Thus, the maximum possible offense level for a first-time offender under the original § 2F1.1 was 19, which translated to a sentencing range of 30–37 months.[9]

Second, after 1987, in response to a variety of stimuli, including the obvious disparity between the low sentences prescribed by the initial guidelines for economic offenders and the much higher sentences prescribed for drug and other offenses, guideline sentences for economic offenses increased steadily through the 1990s. These increases were effected in part by modifying the loss table, which in 1989 was expanded to 18 levels and a maximum loss amount of $80 million.[10] This change alone increased sentences for high-loss defendants because the fact of conviction (BOL 6) plus loss amount could now generate a total offense level of 24 and a sentence range of 51–63 months without resort to any other specific offense characteristics (SOCs). But as time passed, the more important development was a steady accretion of new SOCs that added offense levels on top of the sum of the base offense level and the levels added for loss amount. In 1988, the fraud guideline contained only one aggravating SOC other than loss amount. By 2000, there were sixteen aggravating SOCs other than loss amount, which could plausibly add from 2 to 14 offense levels in any given case.[11] Moreover, many of these enhancements correlated strongly with the occurrence of high-dollar fraud.[12]

Key to understanding the current dysfunction of the fraud guideline for high-loss offenders is recognition that, *because of the logarithmic character of the 43-level Sentencing Table, each increase in offense level has an ever-greater absolute effect on sentence length, the higher one goes up the Table.* Adding one offense level to the total of a first-time offender who previously had an offense level of 19 (the original 1987 maximum under § 2F1.1) increases his minimum sentence by 3 months and his maximum by 4 months. The same one-level increase from an offense level of 30 increases the defendant's minimum sentence by 11 months and his maximum by 14. And a one-level increase for an offender with an offense level of 36 increases his minimum by 22 months and his maximum by 27. Consequently, as the years passed and the guidelines added more and more SOCs, and thus more and more offense levels to the scores of defendants who by virtue of large loss amounts were already bound for prison, the guideline sentences for such defendants increased disproportionately to those who committed lower-loss crimes.

Third, one must understand how the "Economic Crime Package of 2001" was developed and enacted. The years-long process that produced the package was driven by two different concerns, and therefore proceeded until the very end on two parallel, largely nonintersecting, tracks. On one track was a group that believed the formerly separate theft and fraud guidelines were duplicative and in many places logically flawed or badly drafted. This group set out to consolidate and rewrite the two guidelines so that they would be easier to apply and would better differentiate between different types and grades of economic offender. On the other track was a group concerned with sentence severity. This second group was divided between one faction that thought the guidelines over-emphasized imprisonment for low-level offenders and a second contingent (including the Justice Department and many judges and probation officers) that felt the economic crime guidelines did not sufficiently punish serious economic criminals. A considerable number of important contributors to the severity debate held both views.

Those concerned with the technical deficiencies in the former theft and fraud guidelines focused on the many theoretical, definitional, and structural issues presented by the consolidation and redrafting project. The new consolidated § 2B1.1 went through a near-infinity of drafts that were circulated, commented upon by all the interested parties, redrafted, and even, in the case of the new "loss" definition, field-tested by judges and probation officers at a special meeting convened by the Sentencing Commission for that purpose.[13]

Those worried about severity made some contributions to the technical side of the project, but focused most of their efforts on reconfiguring the loss table. They produced a new loss table that both increased sentences for high-loss offenders and reduced sentences for low-loss offenders.[14]

The high-end effects were the most dramatic. The old 2000 loss table contained 18 levels and topped out at $80 million. By contrast, the new 2001 loss table provided *26 levels* of enhancement for loss and topped out at $100 million.

In its 2015 amendments, the Commission has laudably adjusted the loss table and other related dollar-based guideline measures to account for inflation.[15] In that connection, it is interesting to note that the $100 million top of the 2001 loss table was worth only about $70 million in 1989.[16] Thus, at the high end of the loss table, the new 2001 guidelines assigned an additional 8 offense levels' worth of punishment to an amount of loss worth *less* in constant dollars than the top of the 1989 loss table. Putting it another way, *the sentencing effect of an $80 million loss in 1989 dollars was more than doubled by the 2001 guidelines.*[17]

Although the result of the two-track reexamination of the economic crime guidelines was a single § 2B1.1, the truth (as I can attest from personal involvement in the whole long affair) is that surprisingly little explicit attention was paid to how the results of the technical rewrite would coalesce with the results of the loss table restructuring. It was not that the 2001 consolidated guideline added lots of new specific offense characteristics. Indeed, the number of SOCs remained static because the 2001 guideline eliminated the former more than minimal planning enhancement while adding a new two-tiered enhancement for multiple victims. However, we failed to consider carefully the *combined effect* of the very large increases at the mid-to-high end of the new loss table and all the specific offense characteristics that survived the transition from the old separate guidelines to the new consolidated one.

For example, under old § 2F1.1 (2000), a first-time offender fraud defendant who caused a loss of $10.1 million would have a Base Offense Level of 6, plus a 15-level increase for loss amount, meaning that his offense level before the addition of any specific offense characteristics would be 21, or 37–46 months. Under new § 2B1.1 (2001), the same defendant would receive a 20-level increase for loss, meaning that his offense level before SOCs would be 26, or 63–78 months. In short, leaving SOCs aside, the changed loss table produced a minimum sentence increase for this defendant of 26 months or a little more than 2 years. Even standing alone, such an increase—2 years of a person's life—is hardly insubstantial.

But stacking the same old pre-2001 SOCs, *plus the additional role enhancements available from Chapter 3*, on top of the numbers generated by the newly enhanced loss table magnified the sentencing impact of those old enhancements dramatically. Assume our hypothetical $10-million-loss defendant were eligible for eight additional offense levels based on SOCs and role adjustments: 2 levels for sophisticated means, 2 levels for more than $1 million gross receipts, 2 levels for abuse of trust (§ 3B1.3), and 2 levels for aggravating role (§ 3B1.1). Under *old* § 2F1.1 (2000), this would generate an increase in offense level from 21 to 29, and in a hike in sentencing range from 37–46 months to 87–108 months, *or about another 4 years imprisonment*. But under *new* § 2B1.1 (2001), the same enhancements would raise the same defendant's offense level from 26 to 34, and his sentencing range from 63–78 months to 151–188 months, *an additional 7 years*. In other words, the recalibrated 2001 loss table imposed both a direct (and consciously intended) sentence increase on high-loss defendants and an even larger indirect sentence increase due to interaction of non-loss SOCs with the logarithmic progression of the Sentencing Table. The combination of the direct and indirect increases effectively doubled the guideline sentences of some high-loss defendants, a result few of the participants in the drafting process consciously foresaw.[18]

Fourth, by unhappy coincidence, the effective date of the Economic Crime Package was November 1, 2001, only about a month before the bankruptcy of the Enron Corporation and the ensuing flood of corporate accounting fraud scandals that rocked the economy and produced the Sarbanes-Oxley Act of 2002. The coincidence was an unhappy one because the political furor of that year generated pressure for even further increases in economic crime sentencing levels—which had just been raised to historic levels only months before, and which no one, outside of Congress, felt to be unduly lenient.[19] I have told the story of Sarbanes-Oxley and the guidelines elsewhere.[20] But for present purposes the important point is that the Commission felt obliged to raise economic crime sentences even higher, particularly for big financial frauds, so it enacted five changes of importance here: (1) The Base Offense Level for fraud crimes was raised from 6 to 7. (2) The Commission amended the loss table again, adding a 28-level increase for more than $200 million and a 30-level increase for more than $400 million.[21] (3) The Commission added an additional 2-level enhancement for 250 victims,[22] on top of the existing 2- and 4-level enhancements for 10 and 50 victims.[23] (4) The Commission added a 4-level enhancement for offenses involving securities or commodities law violations by corporate officers or securities dealers and advisers.[24] (5) The Commission expanded the 4-level enhancement for substantially jeopardizing a financial institution to include defendants who endangered the solvency of large companies or 100 or more individuals.[25]

Note that, with the exception of the increased Base Offense Level, every 2003 amendment to § 2B1.1 is either directly triggered by a high loss amount (the Loss Table amendments) or is highly correlated to a high loss amount (250 victims, securities or commodities law offenses by insiders, and endangerment of solvency of large companies or many people).[26] The cumulative effect of the evolution of the economic crime guidelines from 1987 to 2000, the 2001 Economic Crime Package, and the 2003 Sarbanes-Oxley-driven amendments has been: (1) to give loss amount ever-increasing weight, while (2) progressively teasing out a long list of factors that are highly correlated with big-dollar frauds[27]—and for which, therefore, the large enhancements in the Loss Table are already a proxy—and giving

those factors independent, cumulative, logarithmic weight in setting a sentence.

To show the progressive increase in guideline sentences for fraud defendants over the past quarter-century, I attach Tables A-1 and A-2 showing the sentences the guidelines prescribed for an illustrative set of defendants in 1987, 1989, 1991, 1998, 2001, and 2003. The final column shows the effects of the proposed 2015 amendments on the same set of hypothetical defendants.

## II. The Sentencing Commission's Analysis of the Fraud Sentencing Data from FY 2012

The Sentencing Commission has quite sensibly been interested not merely in what effect § 2B1.1 has on hypothetical defendants, but on how that guideline is applied in actual cases. Commission staff has analyzed the cases sentenced under § 2B1.1 in FY 2012 and presented some very interesting statistics, which can be accessed at the Commission's website.[28]

Several critical facts emerge from this data. First, out of 8,503 fraud defendants sentenced in 2012, only 123 were involved in cases with losses higher than $20 million, and only 14 were sentenced for frauds involving more than $100 million.[29] Put another way, only 123 defendants were sentenced using the top five of the sixteen total steps on the current loss table, and only fourteen were sentenced using the top three. This fact in itself should give rise to serious doubt about the structure of a table that devotes nearly one-third of its 16 levels to parsing the relative severity of the crimes of just over one percent of the defendants to whom it is applied.

Second, Commission staff helpfully identified the number of specific offense characteristics other than loss that were found by the court and applied in each FY 2012 defendant's case. Figure 8 in the staff presentation (reproduced below) suggests that relatively few SOCs are applied in most cases, even at the high end of the loss spectrum. For example, the chart shows that in seven of the eight loss categories of $1 million and higher, half or more of the defendants were sentenced with either zero or only one SOC in addition to loss. Some have suggested that this data means that too many SOCs are not really a problem at high loss levels.[30] But considered more carefully, the Figure 8 data cannot support that sanguine conclusion.

To begin, even taken at face value, Figure 8 tells us that one-third to one-half of all defendants with loss amounts exceeding $2.5 million are sentenced with two or more SOCs. More importantly, Figure 8 only counts *types* of SOCs, not offense level increases imposed as a result of each SOC. For example, an enhancement for more than 250 victims counts as one SOC, while violation of a securities law by an officer of a publicly traded company counts as another. A mere two SOCs doesn't sound so bad... until you realize that together they add 10 offense levels (6 for more than 250 victims and 4 for violation of securities law) on top of the Base Offense Level of 7 and however many additional levels were added for loss—which effectively triples the defendant's guideline range.[31]



Figure 8. Number of Specific Offense Characteristics Applied for §2B1.1 Offenders in Each Loss Table Category (N=7,256), Fiscal Year 2012



Figure 9
Selected Chapter Three Guideline Application
for §2B1.1 Offenders
(N=8,503)
Fiscal Year 2012

Aggravating Role (§3B1.1): Not Applied 89.5, Applied 10.5
Mitigating Role (§3B1.2): Not Applied 94.0, Applied 6.0
Abuse of Position of Trust or Use of Special Skill (§3B1.3): Not Applied 84.4, Applied 15.6

SOURCE: U.S. Sentencing Commission 2012 Fraud Team Datafile. Of the 84,173 cases, 9,678 were excluded due to incomplete guideline application information. Of the 74,495 remaining cases, 65,985 were excluded that were not sentenced under §2B1.1. Of the remaining 8,510 cases sentenced under §2B1.1, seven were excluded that were sentenced using a Guidelines Manual in effect prior to November 1, 2001 or for other logical criteria. Cases missing information for a category were excluded from the analysis for that category.

Moreover, Figure 8 only counts "specific offense characteristics" as such. It does not count the additional role-in-the-offense enhancements that may be applied under Chapter 3. Figure 9, reproduced below, shows that the Aggravating Role adjustment (§ 3B1.1) is applied to 10.5 percent of fraud cases under § 2B1.1, and the Abuse of Trust or Use of Special Skill adjustment (§ 3B1.3) to 15.6 percent. These adjustments are not included in the Figure 8 chart, and it is therefore reasonable to assume that a fair number of defendants with losses over $1 million also received one or both of these adjustments in addition to loss and some number of SOCs.

In addition, there is every reason to doubt the validity of the data in Figures 8 and 9. I say this not because I doubt that Commission staff carefully collects and accurately reports the data they receive, but because the data reflect only the SOCs and role enhancements found to exist by the judge and applied in the sentencing calculus. What the staff cannot capture is the effect of the simple fact that virtually all these cases were plea bargained and that, particularly at high loss levels, SOCs and role adjustments are routinely bargained away.

How can we know that the numbers reported by the courts often do not reflect how many SOCs would apply if the facts of a high-loss case were honestly assessed? Common sense. For example, Figure 8 of the staff's presentation indicates that 22.4 percent of the FY 2012 cases with loss over $20 million involved no SOCs—which seems highly improbable without negotiated manipulation of the numbers. Ask yourself how it would be possible to commit a $20 million fraud that did not involve at least one of the following: (a) at least 10 victims, (b) mass marketing, (c) sophisticated means, (d) identity theft in some form, (e) derivation of more than $1 million gross receipts from a financial institution, (f) charitable fraud, (g) bankruptcy fraud, or (h) violation of securities or commodities law by a corporate insider or broker. Such a thing may be possible, but the suggestion that an offense of such exquisite rarity occurred in more than one-fifth of the 67 reported cases with more than $20 million in loss strains credulity to the breaking point. Figure 8 also indicates that over 43 percent of all cases with loss over $20 million involved only one SOC, a figure which is scarcely more believable.

Why might the government be disposed to factor-bargain away SOCs in high-loss cases? Recall that any fraud defendant with a loss over, say, $20 million is already facing an offense level of 29 (BOL 7 + 22 levels for loss) and a sentencing range of 87–108 months (7–9 years) *without a single SOC or role adjustment*. Addition of 2 levels for sophisticated means or any other enhancement generates a total level 31 and a sentencing range of 108–135 months (9–11 years). Add 2 more levels for, say, a mere 10 victims and the offense level becomes 33 and the sentencing range 135–168 months (11–14 years). Prosecutors rarely press for

sentences materially higher than that in a negotiated plea for a white collar defendant, even one with a very big loss.[32] This phenomenon is evident in Figure 6 of the staff's presentation (reproduced below), which shows that the average sentence for the 68 defendants in the >$20 million loss category was exactly 108 months, while the average for the 42 defendants in the >$50 million loss category was even lower, at 90 months. Therefore, when the parties want a plea agreement that generates a sentencing range a high-loss defendant might be disposed to accept and a judge to impose, they must either fact-bargain over loss amount, or factor-bargain away those SOCs and role adjustments that legally apply, but that are not necessary to get the sentence to the agreed level, or enter into to a substantial assistance agreement, or some combination of the three. The available data strongly suggests that factor-bargaining is reasonably common in such cases.

In addition, the ubiquity of bargained pleas in big fraud cases suggests that loss amount itself is commonly negotiated. If so, the distribution of sentenced defendants among loss categories reported in the staff's Figures 6 and 8 probably under-reports the number of defendants whose crimes actually caused losses in the highest categories—and thus underestimates the distorting effect of the interaction of high loss with multiple SOCs and role adjustments.

Finally, the staff's Figure 6 shows that, in high-loss cases, judges are refusing to give effect to multiple SOCs and role adjustments even when they are found to exist and are factored into the official guideline calculation. Starting with cases involving a more than $1 million loss, the gap between the bottom of the calculated guideline range and the sentence actually imposed grows dramatically with every step to the right to the next higher loss plateau. In short, even though the parties may in many cases be muting the effect of multiple SOCs and role adjustments through plea bargaining, the higher the loss plateau, the less judges are inclined to impose the sentences called for by even artificially depressed guideline levels.

Now the Commission might ask, "Why should we care about excess SOCs and role adjustments in high-loss cases if they are being routinely bargained away?" Two reasons: First, the presence of so many surplus aggravating factors gives prosecutors unfair bargaining leverage. It means that, in a high percentage of high-loss cases, the government can say, "If you go to trial, the guideline calculation will generate a sentencing range of 20 to 30 years or more—which at least some judges will take seriously and impose. But if you plead guilty, we can negotiate loss amount and factor-bargain away those superfluous SOCs and role adjustments, and bring the range down to a reasonable number of years somewhere in the single or low double digits." The guidelines undoubtedly play a role in all plea negotiations. Properly conceived, that role is to set out for the parties the parameters, upper and lower, of what the Sentencing



Figure 6
Average Guideline Minimum and Average Sentence for §2B1.1 Offenders in Each Loss Table Category
Fiscal Year 2012

Commission believes is a reasonable sentence. But if the guidelines routinely call for sentences the Commission does not really believe to be proper in the cases to which they nominally apply, then the guidelines cease to serve as honest advice to the parties and the courts about proper punishment, and become nothing more than a bludgeon for the government.

Second, leaving aside plea bargaining effects, the Sentencing Commission should not endorse rules that, if honestly applied, recommend sentences the Commission does not believe appropriate and that judges will not impose. To wave away concerns with excess SOCs for high-loss defendants because they rarely drive actual sentences is a plain dereliction of the Commission's duty. If the Commission truly believes that the sentences called for by an honest application of these guidelines to high-loss offenders would produce just sentences—sentences it recommends and would be willing to impose if it were the judge—that is one thing. But if the Commission is unwilling to change these rules only because they are so obviously inappropriate in most of the cases to which they nominally apply that the system now refuses to enforce them, then leaving the rules alone is to perpetuate a pernicious official fiction—which is no less pernicious merely because its worst impact is felt by only a few hundred defendants each year.

### III. The Commission's Amendments Do Little to Solve the Problem of Distorted Sentences for High-Loss Defendants

If the Commission is indeed determined to solve the problem of unreasonably high guideline sentences in high-loss cases—those identified by Judge Saris as involving loss of more than $1 million—the amendments adopted in this cycle do very little to accomplish that end.

*Inflation Adjustment.* Adjusting the loss table for inflation provides a 2-offense-level sentence reduction for defendants at every level of the loss table who happen to fall in the zone created by adjusting the top of the next lowest category for inflation. An inflation adjustment is eminently reasonable, but the change provides no special benefit to high-loss cases. Indeed, because the loss categories are more closely bunched at the bottom of the table (i.e., the difference between a 2-level and 4-level loss enhancement is only $5,000, whereas the difference between a 24-level and 26-level loss enhancement is $50 million), and because there are far more defendants in the lower loss levels, this change will benefit many more low-loss than high-loss defendants.

*Victim Adjustments.* Beginning in November 2003, § 2B1.1(b)(2) contained enhancements of 2, 4, and 6 levels for cases with 10, 50, and 250 victims. The rationale for these enhancements was that a defendant who steals directly from many people has, in general, inflicted harm on more persons than a defendant who steals directly from only one.[33] Thus, it was thought reasonable to include in the guidelines some acknowledgement of that fact. However, the number of victims often correlates with loss amount and should not be overemphasized as a separate factor. The 6-offense-level increase triggered by 250 victims—a situation not uncommon in high-loss cases—nearly doubled the applicable guideline sentence.[34] Plainly, mere victim number had assumed far too much importance.[35]

In January 2015, the Commission proposed addressing the undue influence of victim number by reducing the size of the § 2B1.1(b)(2) victim enhancements from 2, 4, and 6 levels to 1, 2, and 3 levels.[36] This was a sensible proposal, and an approach the Commission should consider applying to other § 2B1.1 SOCs. However, in the final April 2015 version of the amendments, the Commission abandoned the idea of halving the effect of victim number. Instead, it rewrote § 2B1.1(b)(2) to deemphasize victim number while elevating the importance of the *degree* of financial harm imposed on victims. That hybrid is discussed in the next section.

*Substantial Hardship.* In January 2015, the Commission proposed a new enhancement which would add 1, 2, or 3 offense levels based on a finding of "substantial financial hardship" to 1, 5, or 25 victims.[37] I understand the theory of this amendment inasmuch as I proposed the basic idea back in 1998.[38] That proposal for a free-standing financial hardship adjustment mutated during the 2003 debate over the post-Sarbanes-Oxley round of amendments into an alternative means of triggering the 4-level adjustment for endangering the safety or soundness of financial institutions or large companies found in § 2B1.1(b)(16)(B) (2014).

In my March 2015 comments on the proposed amendment, I wrote:

> I no longer think that a separate adjustment for imposing substantial financial hardship makes good practical sense, particularly if it is a multi-level adjustment scaled (necessarily somewhat arbitrarily) to particular numbers of victims. At a moment when we should be trying to reduce the number of difficult-to-exactly-define aggravators in § 2B1.1, this amendment would add one.
>
> Moreover, the imposition of substantial financial hardship surely correlates to some degree with large loss amount. Consequently, whatever ameliorative effect on high-loss cases the proposed amendment to the victim table of § 2B1.1(b)(2) [cutting the enhancements for 10, 50, and 250 victims from 2, 4, and 6 levels to 1, 2, and 3 levels] may have, the new substantial hardship enhancement will take away in at least some cases. In short, the new amendment will serve primarily to add yet another to the proliferating list of SOCs that can boost the sentences of fraud defendants generally, and high-loss defendants in particular.[39]

The Commission does not seem to have been entirely persuaded. In its final April 2015 amendments, the

**Ex 6, p. 8**

Commission melded its proposed substantial hardship amendment with its effort to reduce the effect of mere victim number to produce a new § 2B1.1(b)(2) that reads as follows:

(Apply the greatest) If the offense—

(A) (i) involved 10 or more victims; or (ii) was committed through mass-marketing; or (iii) resulted in substantial financial hardship to one or more victims, increase by 2 levels;

(B) ~~involved 50 or more victims~~ resulted in substantial financial hardship to five or more victims, increase by 4 levels; or

(C) ~~involved 250 or more victims~~ resulted in substantial financial hardship to 25 or more victims, increase by 6 levels.⁴⁰

The result is a curious hybrid. On the one hand, it retains both an enhancement based on mere victim number (10 or more) and the original 2-, 4-, and 6-level tiered structure. On the other hand it eliminates the 4-level and 6-level enhancements based on victim number alone, requiring instead proof of "substantial financial hardship" to multiple victims.

This change may have a very modest net ameliorative effect in the universe of high-loss cases. Defendants will no longer receive 4 or 6 levels merely for large victim numbers. Moreover, victims who have suffered "substantial financial hardship" as defined in new Application Note 4(F) to § 2B1.1 are a relatively small subset of victims generally. And even in cases where "substantial financial hardship" occurred, proving it for 5 or 25 victims is likely to prove more troublesome than merely counting 50 or 250 victim heads, and thus the government may routinely forego the effort or bargain away the enhancement.

On the other hand, virtually all high-loss defendants will continue to qualify for at least the 2-level bump for 10 or more victims. Some who would formerly have been hit with increases for 50 or 250 victims will get increases of the same size because they caused substantial hardship to a relative few of those victims. And some who stole large amounts from 5 or 25 victims rather than lesser amounts from 50 or 250 victims will actually receive larger enhancements than they did before.

In short, the number of cases to which 4-level or 6-level § 2B1.1(b)(2) enhancements apply may diminish, but to what extent is anybody's guess.

*Sophisticated Means.* In 2015, the Commission amended the sophisticated means enhancement, § 2B1.1(b)(10), to specify that it applies only if the defendant being sentenced engaged in or aided and abetted the sophisticated behavior giving rise to the enhancement, as opposed to the offense as a whole. The change seems unobjectionable. In practice, it may give some relief to defendants with relatively minor roles in complex schemes. But particularly in light of the aiding and abetting provision, it seems unlikely to affect very many cases.

*Insufficient Aggregate Effect of Proposed Amendments.* The Commission's proposed amendments will reduce the guideline sentences of some fraud defendants. However, as illustrated by the representative cases in Tables A-1 and A-2 below, most of those reductions will go to defendants who caused moderate to moderately high loss. This seems odd given Judge Saris's assertion that the courts and the Commission were satisfied with the operation of § 2B1.1 for those defendants.

Odder still is the fact that these amendments will surely have no effect at all on most high-loss defendants. Unless a high-loss defendant happens to fall in the inflation-adjusted zone of the loss table or be subject to a multiple victim enhancement, his guideline calculation will be untouched. Even for the few defendants who fortuitously get the full benefit of both the main 2015 amendments, the maximum possible reduction would be 6 levels: 2 for falling in the inflation-adjusted loss zone and 4 more if the case involved more than 250 victims, but not at least 5 victims who suffer "substantial financial hardship," thus transforming a 6-level victim boost to a mere 2. For a defendant with a high multimillion dollar loss and multiple potential SOCs and role adjustments, even hitting the 6-level jackpot would scarcely dent his total offense level. See for example, hypothetical Defendants H, I, and J in Tables A-1 and A-2.

The real takeaway from the 2015 tweak of § 2B1.1 is that the Commission seems not to understand, or is at least unwilling to address, the three most salient points about the fraud guideline. First, § 2B1.1 *does not work* in a significant number of high-loss cases. Second, it does not work for such cases (a) because the loss table is bloated, and (b) because the Commission keeps teasing out—and awarding additional offense levels for—more and more culpability factors for which loss is already a proxy. The 2015 amendments do not address the bloat in the loss table. And as to the factor creep problem, while the 2015 amendments decrease the influence of one factor, victim number, they increase the influence of a different one, financial hardship, by an amount that for at least some defendants exactly offsets the victim number decline. Overall, the results will be barely perceptible.

### IV. Suggestions for Making High-Loss Guidelines Sentences Realistic and Useful

If the Commission really wants to fix the problem of unrealistic guideline sentences for high-loss defendants, it must address three issues: (1) the failure to set a normative upper limit on punishment for financial crime, (2) the bloated loss table, and (3) the logarithmic sentence increases generated by multiple SOCs and role adjustments. Therefore, I would suggest the following measures.

#### A. Set a maximum limit on punishment for economic crime

The seminal structural flaw in § 2B1.1 is the failure (a) to set a ceiling on the punishment government can justifiably

Ex 6, p. 9

mete out for the most serious financial crimes, and then (b) to scale the punishments for lesser forms down from that maximum. In virtually every other crime category, the guidelines provide some conception of the worst form of that crime likely to face a sentencing judge and prescribe a rough maximum sentence for that form. For first degree murder, the offense level is 43 (life imprisonment).[41] Treason where "the conduct is tantamount to waging war against the United States" has an offense level of 43.[42] The guideline for an attempted murder provides a maximum offense level of 41 (27–33.75 years), even in an aggravated case like an attempted contract killing where the victim sustained permanent injury.[43] Similarly, the robbery guideline, § 2B3.1, is structured so that even a robbery with virtually every possible aggravator generates an offense level of no more than 41.[44] Even a complex (and quite tough) guideline like § 2D1.1 governing drug crimes is sufficiently well-calibrated that even its most serious forms, with all applicable SOCs counted, rarely produce offense levels that equal or exceed 43.

The result of having a ranking system that sets a rationally supportable upper limit on the most severe punishment that should be imposed for the most serious variant of a crime type is that judges can take seriously both the highest sentence and the scale of lower sentences for that crime type. Consider, for example, the robbery guideline, which prescribes an offense level of 41 (27–33.75 years) for an extremely aggravated form of robbery involving a federally insured bank, a shooting causing life-threatening injury, and a huge pecuniary loss. Some judges might think 27 years too much for such an offense. But it is at least within the realm a rational sentencing authority might recommend, and thus judges will seriously consider imposing it. That being so, if application of the robbery guideline to a second defendant produces a lower offense level of 31 (9–11.25 years), the judge will take that offense level seriously, too, both as an indication of what sentence the Commission actually believes should be imposed and as a comparative measure of how much less serious the second offense is than the first.

By contrast, § 2B1.1 sets no meaningful upper limit on the punishment for economic crime. In high-loss cases, the current version of § 2B1.1 can quite easily generate offense levels substantially above the 43 required for life imprisonment,[45] which implies that the Commission thinks big financial fraud is normatively far *worse* than murder, treason, being a trigger-happy bank robber, or running a major drug cartel. This sort of guideline excess breeds two problems.

First, virtually no one believes that financial fraud is worse than murder or treason or blood-soaked bank robbery; in consequence, with rare exceptions, judges are unwilling to sentence high-loss fraud defendants to the terms nominally prescribed by the guidelines. Indeed, in those cases that score worst by the metrics adopted in § 2B1.1, the guidelines do not actually prescribe a sentence. An offense level over 43 is not associated with a recommended term of imprisonment; it is merely a *really big number*—a sort of numerical epithet—that provides the sentencing judge with no practical guidance.

Second, and even more importantly as a matter of guideline design, because § 2B1.1 so easily generates offense levels near or above the top of the sentencing table, judges have no useful yardstick for determining the relative severity of cases with lower offense levels.

For example, suppose one high-loss defendant has a calculated offense level of 44. Suppose further that the sentencing judge, like most of her colleagues, does not view that number as a serious indication the Commission intends imposition of a sentence of 30 or more years, so she imposes a sentence of 20 years. Then suppose that, in the next case, the same judge encounters a fraud defendant with a calculated offense level of 38. Should the judge assume that the Commission *does* mean what it says in fraud cases with offense levels below 43 and impose the 235-month (roughly 20-year) sentence called for by the low end of the level 38 sentencing range? If so, that would treat the level 38 defendant virtually identically to the level 44 defendant. Or should she try to achieve some proportionality between the sentences of the level 38 and level 44 defendants? If she decides to do the latter, given that subtracting 6 offense levels roughly halves the applicable guideline minimum sentence, should the judge impose a sentence of 10 years on the level 38 defendant (one-half the 20-year sentence she imposed on the level 44 defendant)? And if she does that, what should she do when she encounters a defendant with an offense level of 32, for whom the guideline minimum would be 121 months, or just over 10 years? In short, given that the sentences nominally prescribed for some undefined subset of high-loss cases are universally understood to be fictional, judges cannot now determine the point on the severity scale where the Commission really means what it says.

Accordingly, the Commission should determine the maximum punishment that should be imposed for financial crime absent the most extraordinary circumstances—and then reverse-engineer § 2B1.1 from that number downward. The Commission should not try to write into the guideline factors that might justify an extraordinary sentence above this maximum. Identifying extraordinary cases can properly be left to sentencing judges in the exercise of their power to either depart from or vary above the prescribed range.

### B. Give the loss table a haircut

Even if the Commission is unprepared to reverse-engineer § 2B1.1 *in toto*, it could take a number of simple steps that would materially reduce the likelihood of transparently silly, way-more-than-life-sentence guideline calculations in high-loss cases. The first of these steps would be to eliminate the top 4 levels of the loss table (those for loss exceeding $50 million, $100 million, $200 million, and $400 million). In FY 2012, only 56 of the more than 7,000

defendants sentenced under 2B1.1 (or roughly 0.7 percent) fell into these categories. Dividing those few dozen defendants into four groups separated only by arbitrarily chosen loss amounts does not advance the cause of rational sentencing.

However, cutting some or all of the 4 top loss levels would give some room for SOCs and role adjustments to function meaningfully in high-loss cases. Cutting the top 4 would mean that loss amount alone would generate a maximum 22-level enhancement. When added to the base offense level for fraud, this would produce an offense level of 29, and a guideline range of 87–108 months (7.25–9 years) for a first-time offender with no other SOCs or role adjustments.

If loss alone could elevate a sentence only as far as level 29, it would start to make sense for prosecutors to advocate and judges to seriously consider the SOCs in § 2B1.1 and role adjustments in Chapter 3 as means of rationally distinguishing between more and less serious high-loss offenders. For example, if one is starting from a base of 29, a 2-level sophisticated means adjustment added to a 4-level increase for substantially jeopardizing a financial institution produces a level 35 and a range of 168–210 months (14–17.5 years)—a sentence many judges would at least seriously consider. By contrast, if one is starting at a base of 35 (base offense level of 7 plus 28 levels for loss greater than $200 million), the same 6 levels of enhancements generate an offense level of 41 and a range of 324–405 months (27–33.75 years)—a sentencing level judges rarely take seriously in white collar cases.

Remarkably, at the March 12, 2015, hearing on the 2015 amendments, Justice Department representative Benjamin B. Wagner endorsed eliminating the top 4 levels of the loss table:

> [T]here was an interesting proposal in Mr. Bowman's submission, which I think the Commission should consider, about collapsing the top four levels in the loss table and looking at whether or not you should end it at everything over $20 million, that is—is 22 levels, and that's your cap.[46]

It is something of a mystery that, even with Justice Department support, the Commission felt unable to amend the table this year. Perhaps the next amendment cycle will see progress.

### C. Reduce the number, size, and cumulative impact of specific offense characteristics in § 2B1.1

Even if the Commission were to eliminate the 4 top loss levels, the number, magnitude, and potential cumulative effect of the SOCs now in § 2B1.1 is so large that honest application of those SOCs to the facts of high-loss cases would continue to produce unrealistically high guideline ranges.

Consider, for example, hypothetical Defendant I in Tables A-1 and A-2 below, who is CEO of a publicly traded corporation operating a chain of hospitals and nursing homes and, in collusion with four other members of his management team, defrauds Medicaid and Medicare of $10.1 million and causes false statements to be made in required SEC filings. Even though his loss enhancement is "only" 20 levels, SOCs and role adjustments would raise his final offense level to 42, corresponding to a sentence of 360 month (30 years) to life.[47] This defendant surely deserves prison time. Maybe even a lengthy dose of it. But few, if any, judges will consider a minimum sentence of 30 years to be a serious option.

If one is convinced of the need to reduce the number and effect of § 2B1.1 SOCs, a variety of approaches could help achieve that end. Here are a few suggestions:

1. **Cap the cumulative effect of SOCs.** The simplest solution to the proliferating SOC problem would be to impose a cap on the cumulative effect of all SOCs other than loss. If such a cap were enacted, the court would be obliged to determine the loss and all applicable SOCs, but the total offense level could never be more than the sum of the Base Offense Level, plus the offense level increase corresponding to loss amount, plus the applicable number of SOC adjustments, up to, but not exceeding, the cap. The cap could be set at any number the Commission liked, but I would suggest that careful consideration of two factors should determine the result.

First, setting an SOC cap would accomplish the objective suggested above of setting the maximum sentence the Commission will sanction for economic crime, absent the extraordinary circumstances that would justify an upward departure or variance. Therefore, the cap should be set after careful consideration of what that maximum should be. In my own view, the maximum ought not exceed something like 20–25 years. But under no circumstances should any combination of guidelines factors generate an offense level above the top of the Sentencing Table.

Second, loss was chosen as a primary determinant of sentence length in economic crime cases because it is, standing alone, a good general proxy for offense seriousness. Factors in addition to loss, particularly if they are of a type that correlates with loss, should not dramatically overshadow the effect of loss itself. Therefore, I would suggest that the cap be, at the very most, 10 levels because an increase of 10 levels triples the sentence from which one began.[48] It hardly makes sense to allow other factors to have *more than triple* the effect of the primary measure of offense seriousness. Eight levels, which increases a sentence about 2.5 times, or 6 levels, which roughly doubles a sentence, would be better.

The combination of eliminating the top 4 loss levels and capping the effect of non-loss SOCs would have the additional benefit of leaving some room for role adjustments under Chapter 3 to have a meaningful effect on the final offense level calculation even in big cases. By way of illustration, consider hypothetical Defendant J in Tables A-1 and

A-2 below (whose situation is akin to the principal Enron defendants). Under the current guidelines, even if the 2015 amendments were adopted, his final offense level would be 55, including adjustments under Chapter 3 for aggravating role and abuse of trust. In other words, the combination of base offense level, loss amount, and § 2B1.1 SOCs pushes his offense level so high that the Chapter 3 role adjustments are functionally meaningless. However, if, as suggested above, the loss enhancement were capped at 22 levels for more than $20 million, and the SOC adjustments were capped at ten (or fewer), Defendant J's offense level considering § 2B1.1 factors only would be 39 (at most). Accordingly, there would still be room on the Sentencing Table for Chapter 3 role adjustments to count.

**2. Reduce the number of levels assigned to many SOCs.**
Virtually all of the offense level increases associated with § 2B1.1 SOCs are expressed in increments of two. For example, the multiple victim adjustments of § 2B1.1(b)(2) are for 2, 4, and 6 levels, employing sophisticated means triggers a 2-level adjustment, and securities law violations by a broker or dealer trigger a 4-level adjustment. Given that every 2-offense-level increase raises a defendant's sentencing range by 25 percent, it seems doubtful that all of these SOCs really merit sentence increases of the magnitude they trigger.

In January 2015, the Commission proposed amending the multivictim enhancement of § 2B1.1(b)(2) by reducing the increments from 2, 4, and 6 levels to 1, 2, and 3 levels.[49] Although the Commission took a different approach in the final version of this year's amendment to § 2B1.1(b)(2), it should in the future consider whether the value of other SOCs should be reduced in the way originally proposed for § 2B1.1(b)(2).

Even if the Commission is not disposed to halve the value of some § 2B1.1 SOCs for *all* defendants, it should consider that the 25 percent sentence increase resulting from a 2-level SOC translates into much more additional prison time when applied to a defendant at the top of the Sentencing Table than to one at the bottom. Therefore, it might make sense to reduce the offense-level value of SOCs for cases involving loss over a specified amount. For example, the 4-level enhancement for violation of securities law by a dealer or broker might remain for cases with loss less than, say, $1 million, but be reduced to 3 levels if the loss was more than $1 million, and 2 levels if the loss was greater than $20 million. The dual objectives of such graduated enhancements would be to make the sentencing effect of a given SOC somewhat more constant for all offenders and to prevent multiple SOCs from inflating the guideline ranges of high-loss offenders into the zone of unreality.

**3. Eliminate the sophisticated means enhancement.** The theoretical function of the sophisticated means enhancement is to give numerical expression to the idea that frauds involving large amounts of planning activity and high levels of specialized expertise are more blameworthy and socially dangerous than frauds of a simpler sort. While the theory is sound enough,[50] putting it into practice has proven consistently frustrating. If loss is moderately large, courts virtually always find sophisticated means in any but the very simplest schemes, and often even in those.[51] Even when the loss is smaller, judgments about what criminal methods are relatively more sophisticated than the norm are so subjective as to be essentially arbitrary.

Although I advocated the creation of a sophisticated means enhancement back in 1998,[52] I no longer think it serves any useful purpose. It is particularly useless in high-loss cases because stealing really big sums inevitably involves methods the courts characterize as sophisticated means. In such cases it serves only as a nearly inevitable 25 percent boost to already high guideline ranges. The enhancement should be eliminated. If the Commission is unwilling to eliminate it altogether, it should only be available in moderate- to-low-loss cases (perhaps those with losses less than $1 million) as a way of winnowing especially creative swindlers from the common run.

A final possibility for the sophisticated means enhancement would be to eliminate it as a specific offense characteristic that adds offense levels and transform it into a factor judges would be encouraged to consider when determining the position of a sentence within the advisory sentencing range. In other words, the guideline would say that, if sophisticated means were used, the judge should consider it as a factor in setting a sentence above the minimum of the advisory range.

**V. Conclusion**
The Sentencing Commission's multiyear study of the fraud guideline has so far produced a damp squib. Perhaps more time for thought and the confirmation of two new commissioners will produce fireworks next year. At all events, I hope the foregoing analysis and suggestions provide a bit of ammunition for those who would like more percussive change.

**Table A-1. Description of Representative Defendants**

| | |
|---|---|
| Def. A | Teller in federally insured bank. Steals $2,000 from teller drawer. |
| Def. B | Wife of social security recipient. Continues to cash checks after death of spouse. Loss = $11,000. |
| Def. C | Defendant is a postal worker who steals credit cards from the mail and uses them to purchase goods worth $35,000, which he then sells to support a drug habit. |
| Def. D | Defendant commits online auction fraud from his home computer. Causes loss of $55,000 to more than 50 victims. |
| Def. E | Doctor submits false billings to Medicare using complex system of double books. Loss = $125,000. |
| Def. F | Telemarketer runs boiler room with 8 employees. Defrauds more than 250 elderly victims of $250,000. |
| Def. G | Computer expert constructs scheme for stealing credit card and other personal information online. Using this information, he obtains merchandise and phony car loans online totaling $450,000 from 25 individual and institutional victims. |
| Def. H | President of small, publicly traded bank commits bank fraud causing loss of $1.1 million and collapse of the bank. In the course of the offense, he causes false statements to be made in required SEC filings. Thirty employees lose their jobs. |
| Def. I | CEO of publicly traded corporation operating chain of hospitals and nursing homes, in collusion with 4 other members of his management team, defrauds Medicaid and Medicare of $10.1 million and causes false statements to be made in required SEC filings. |
| Def. J | CEO of large conglomerate, in collusion with CFO and other members of management, engage in accounting fraud and stock manipulation causing bankruptcy of company and losses to shareholders and employee pension fund of $410 million. |

**Table A-2. Comparison of Guideline Ranges of Representative Defendants Under Existing Guidelines to Ranges Under Proposed 2015 Amendment[53]**

| | 1987 | 1989 | 1991 | 1998 | Nov. 2001 | Jan. 2003 | 2015 |
|---|---|---|---|---|---|---|---|
| Def. A | 0–6 mos.[54] | 0–6 mos.[55] | 0–6 mos. | 0–6 mos. | 0–6 mos. | 0–6 mos. | 0–6 mos. |
| Def. B | 2–8 mos.[56] | 4–10 mos.[57] | 4–10 mos. | 4–10 mos. | 6–12 mos.[58] | 8–14 mos.[59] | 4–10 mos.[60] |
| Def. C | 12–18 mos.[61] | 15–21 mos.[62] | 15–21 mos. | 15–21 mos. | 27–33 mos.[63] | 30–37 mos.[64] | 24–30 mos.[65] |
| Def. D | 10–16 mos.[66] | 12–18 mos.[67] | 12–18 mos. | 12–18 mos. | 27–33 mos.[68] | 30–37 mos.[69] | 24–30 mos.[70] |
| Def. E | 21–27 mos.[71] | 24–30 mos.[72] | 24–30 mos. | 24–30 mos. | 33–41 mos.[73] | 37–46 mos.[74] | 30–37 mos.[75] |
| Def. F | 37–46 mos.[76] | 41–51 mos.[77] | 41–51 mos. | 51–63 mos.[78] | 78–97 mos.[79] | 108–135 mos.[80] | 78–97 mos.[81] |
| Def. G | 24–30 mos.[82] | 30–37 mos.[83] | 30–37 mos. | 30–37 mos. | 78–97 mos.[84] | 87–108 mos.[85] | 63–78 mos.[86] |
| Def. H | 27–33 mos.[87] | 37–46 mos.[88] | 57–71 mos.[89] | 57–71 mos. | 121–151 mos.[90] | 210–262 mos.[91] | 262–327 mos.[92] |
| Def. I | 57–71 mos.[93] | 87–108 mos.[94] | 87–108 mos. | 87–108 mos. | 151–188 mos.[95] | 262–327 mos.[96] | 360–LIFE[97] |
| Def. J | 57–71 mos.[98] | 121–151 mos.[99] | 121–151 mos. | 151–188 mos.[100] | LIFE[101] (plus 5 levels) | LIFE[102] (plus 16 levels) | LIFE[103] (plus 12 levels) |

**Notes**

1. See, e.g., Frank O. Bowman, III, Sentencing High-Loss Corporate Insider Frauds Post-Booker, 20 Fed. Sent'g Rep. 167, 168 (2008) (arguing that for some high-loss defendants the guidelines "now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense").
2. See, e.g., materials from U.S. Sentencing Commission's Symposium on Economic Crime in New York City, Sept. 18–19, 2013, available at http://www.ussc.gov/research-and-publications/research-projects-and-surveys/economic-crimes/united-states-sentencing-commissionsymposium-economic-crime.
3. Chief Judge Patti B. Saris, Chair, U.S. Sentencing Commission, Remarks for Public meeting of USSC (Jan. 9, 2015), available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150109/Remarks.pdf (emphasis added).
4. Judge Saris echoed the same basic sentiment in the press release accompanying the April release of the 2015 amendments: "We found through comprehensive examination that the fraud guideline provides an anchoring effect in the vast majority of cases, but there were some problem areas, particularly at the high-end of the loss table." See U.S. Sentencing Commission, Press Release, April 9, 2015, available at http://www.ussc.gov/sites/default/files/pdf/news/press-releases-and-news-advisories/press-releases/20150409_Press_Release.pdf.
5. See, e.g., Testimony of James E. Felman, Chair, Criminal Justice Section American Bar Association, Mar. 12, 2015, available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150312/Felman.pdf.
6. U.S. Sentencing Commission, Economic Crime Public Data Briefing (Jan. 9, 2015), available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150109/fraud_briefing.pdf.
7. U.S. Sentencing Commission, Amendments to the Sentencing Guidelines (Preliminary), April 9, 2015, available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20150409_PRELIM_RF_Amendments.pdf.
8. Frank O. Bowman, III, Dead Law Walking: The Surprising Tenacity of the Federal Sentencing Guidelines, 51 Houston L. Rev. 1227, 1255 (2014).
9. This calculation does not include possible increases in offense level and sentencing range arising from Chapter 3 adjustments for role in the offense, etc. Nor does it account for the reduction in offense level and sentencing range that would result from an acceptance of responsibility credit following a plea of guilty, U.S.S.G. § 3E1.1.
10. U.S.S.G. § 2F1.1(b)(1) (1989), App. C amend. 154.
11. U.S.S.G. § 2F1.1 (2000).
12. These included more than minimal planning, scheme to defraud more than one victim, use of mass marketing, sophisticated means, relocation of scheme to another jurisdiction, or commission of scheme from outside the United States, substantially jeopardizing a financial institution, and deriving more than $1 million gross receipts from financial institution fraud.
13. See U.S. Sentencing Commission, A Field Test of the Proposed Revisions to the Definition of Loss in the Theft and Fraud Guidelines (Oct. 20, 1998), available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/19981020_Loss_Definition.pdf.

14. Frank O. Bowman, III, *The 2001 Federal Economic Crime Sentencing Reforms: An Analysis and Legislative History*, 35 Indiana L. Rev. 5, 29–30 (2001).
15. U.S. Sentencing Commission, *supra* note 7.
16. U.S. Bureau of Labor Statistics CPI inflation calculator, *available at* http://data.bls.gov/cgi-bin/cpicalc.pl.
17. Because of the so-called 25% rule, which the Commission has interpreted to mean that the top of any guideline range may be no more than 25% larger than the next lowest range, and the Commission's decision to construct the Sentencing Table with overlapping ranges, any 2-level increase in guideline range above Level 8 produces a 25% increase in guideline minimum. An 8-level offense level increase thus raises the applicable guideline minimum by about 244%.
18. A few astute observers like James Felman did notice the issue, but it was not widely discussed.
19. In the summer of 2002, then-Senator Joseph Biden convened a hearing of the Crime and Drugs Subcommittee of the Senate Judiciary Committee to address the question of whether federal white collar sentences were severe enough. The answer from every witness was, in effect, "Yes. We just raised sentences for serious fraud cases last year and no more increases are called for." *See Penalties for White Collar Crime*, June 19, July 10, July 24, 2002, *available at* http://www.gpo.gov/fdsys/pkg/CHRG-107shrg86740/html/CHRG-107shrg86740.htm (transcript); http://www.c-span.org/video/?170737-1/penalties-white-collar-crime (video).
20. Frank O. Bowman, III, *Pour Encourager Les Autres? The Curious History and Distressing Implications of the Criminal Provisions of the Sarbanes-Oxley Act*, 1 Ohio St. J. Crim. L. 373 (2004).
21. U.S.S.G. 2B1.1(b)(1)(O) and (b)(1)(P) (2003).
22. U.S.S.G. 2B1.1(b)(2)(C) (2003).
23. U.S.S.G. 2B1.1(b)(2)(A) and (B) (2003).
24. U.S.S.G. 2B1.1(b)(14) (2003).
25. U.S.S.G. 2B1.1(b)(12)(B) (2003).
26. Even the one-level increase in Base Offense Level pushed high-loss defendants one notch up on the Sentencing Table's logarithmic scale. If a defendant would have been at a level 31 in 2002, the one-level 2003 BOL bump alone raised his minimum sentence by more than a year, from 108 months to 121 months.
27. Another such enhancement—for high-dollar health care frauds—was added in 2011 as U.S.S.G. 2B1.1(b)(8).
28. U.S. Sentencing Commission, *supra* note 6.
29. *Id.* at Slide 9, Fig. 4.
30. *See, e.g.,* Patti B. Saris, "The 2015 Economic Crime Amendments," Keynote Address at the Regulatory Offenses and Criminal Law Conference Center on the Administration of Criminal Law, New York University School of Law, April 14, 2015, *available at* http://www.ussc.gov/sites/default/files/pdf/news/speeches-and-articles/speech_saris_20150414.pdf.
31. For example, in a fraud case with a loss of greater than $2.5 million, the base offense level would be 7, with an additional 18 levels added for loss, totaling 25, which carries a sentencing range of 57–71 months. Adding 10 levels would produce a final offense level of 35, which carries a sentencing range of 168–210 months.
32. *See, e.g.,* Walter Pavlo, *Doing Life for a White-Collar Crime—The Tale of Christian Allmendinger*, Forbes, March 19, 2013, comparing the 45-year and 60-year sentences imposed on defendants who went to trial in a $100 million fraud case with the 5-, 10-, and 15-year sentences imposed on defendants in the same case who pled guilty.
33. Of course, the ripple effects of a large fraud perpetrated against a single victim, particularly if the "victim" is an institution like a bank or insurance company or other big employer, may impact a very large number of individual people.
34. Every 2-level increase on the sentencing table raises the low end of the applicable sentencing range by at least 25%. A 6-level increase raises the low end of the range by (25%)(25%)(25%) or about 95%.
35. For better or worse, I probably bear some responsibility for the existence of the § 2B1.1(b)(2)(2014) victim adjustments inasmuch as I proposed such adjustments in 1998, Frank O. Bowman, III, *Coping With "Loss": A Re-Examination of Sentencing Federal Economic Crimes Under the Guidelines*, 51 VAND. L. REV. 461, 501–2 (1998), and advocated for them during the debate over the 2001 Economic Crime Package. Whether or not the idea originally had merit, the 2003 version of § 2B1.1(b)(2), with its potential 6 levels of victim enhancements, seriously over-egged the pudding.
36. U.S. Sentencing Commission, *Proposed Amendments to Sentencing Guidelines* (Jan. 16, 2015), *available at* http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/2015014-RFP-Amendments.pdf.
37. *Id.*
38. Bowman, *Coping With "Loss," supra* note 35, at 502.
39. Frank O. Bowman, III, *Comment on Proposed Amendments to Economic Crime Guideline, § 2B1.1* (Feb. 19, 2015), *available at* http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150312/Bowman.pdf
40. U.S. Sentencing Commission, *supra* note 7.
41. U.S.S.G. § 2A1.1.
42. U.S.S.G. § 2M1.1.
43. U.S.S.G. § 2A2.1.
44. U.S.S.G. § 2B3.1 prescribes an offense level of 41 for a robbery involving a federally insured bank in which more than $5 million was stolen and a victim was shot and suffered life-threatening injury.
45. *See* Pavlo, *supra* note 32 (noting that one defendant in a $100 million fraud had a guideline offense level of 51).
46. Public Hearing on Proposed Amendments to Federal Sentencing Guidelines, March 12, 2015, at 119–20 (testimony of Hon. Benjamin B. Wagner, United States Attorney, Eastern District of California).
47. Assumes fraud conviction (Base Offense Level 7), increase of 20 levels for loss of more than $9.5 million but less than $30 million (using the new inflation-adjusted loss table), 2-level sophisticated means, 4-level violation of securities law by officer of publicly traded corporation, 3-level health care fraud greater than $7 million, 4-level aggravating role, 2-level abuse of trust.
48. For example, if the base offense level plus a loss over $20 million generated an offense level of 29 (87–108 months), an addition of 10 levels gives an offense level of 39 (262–327 months), or triple the sentencing range for level 29. The 25% rule upon which the Sentencing Table is based gives a 10-level increase the same tripling effect at every starting point beginning at Offense Level 12, Criminal History Category I.
49. U.S. Sentencing Commission, *supra* note 36.
50. *See* Bowman, *Coping With "Loss," supra* note 35, at 497–500.
51. For a survey of the case law, see Roger W. Haines Jr., Frank O. Bowman, III, & Jennifer C. Woll, Federal Sentencing Guidelines Handbook, 2014–2015 ed., 400–403.
52. Bowman, *Coping with "Loss," supra* note 35.
53. Table A-2 assumes first-time offenders (Criminal History Category I) convicted after trial. Sentences for defendants pleading guilty would be slightly lower due to the acceptance of responsibility reduction. Sentences for defendants with criminal records would be slightly (in some cases considerably) higher. Shaded boxes indicate a sentence increase due to guideline change.
54. Offense Level 6. Assumes no "More than minimal planning" (MMP).
55. Offense Level 6. Assumes no MMP.
56. Offense Level 8. Assumes no MMP.

57 Offense Level 9. Assumes no MMP.

58 Offense Level 10. Assumes no MMP.

59 Offense Level 11. Assumes fraud conviction (Base Offense Level 7), 4-level increase for loss greater than $10,000.

60 Offense Level 9. Assumes fraud conviction (Base Offense Level 7), 2-level increase for loss greater than $6500 but less than $15,000.

61 Offense Level 13. Assumes fraud conviction, MMP, 2-level increase for abuse of trust.

62 Offense Level 14. Assumes fraud conviction, MMP, 2-level increase for abuse of trust.

63 Offense Level 18. Assumes Base Offense Level of 6, 6-level increase for loss greater than $30,000, 4-level increase for undelivered U.S. Mail (U.S.S.G. § 2B1.1 app. note 3(B) (2001)), 2-level increase for abuse of trust.

64 Offense Level 19. Assumes fraud conviction (Base Offense Level 7), 6-level increase for loss greater than $30,000, 4-level increase for undelivered U.S. Mail (U.S.S.G. § 2B1.1 app. note 4(C)(i) (2003)), 2-level increase for abuse of trust.

65 Offense Level 17. Assumes fraud conviction (Base Offense Level 7, 4-level increase for loss greater than $15,000 but less than $40,000, 4-level increase for undelivered U.S. Mail (U.S.S.G. § 2B1.1 app. note 4(C)(i) (2003)), 2-level increase for abuse of trust.

66 Offense Level 12. Assumes MMP.

67 Offense Level 13. Assumes MMP.

68 Offense Level 18. Assumes fraud conviction, 4-level increase for fewer than 50 victims, 2-level increase for sophisticated means.

69 Offense Level 19. Assumes fraud conviction (Base Offense Level 7), 6-level increase for loss greater than $30,000, 4-level increase for fewer than 50 victims, and 2-level increase for sophisticated means.

70 Offense Level 17. Assumes fraud conviction (Base Offense Level 7), 6-level increase for loss greater than $40,000 but less than $95,000, 2-level increase for fewer than 50 victims [Proposed 2B1.1(B)(2)(b)], and 2-level increase for sophisticated means.

71 Offense Level 16. Assumes MMP, 2-level abuse of trust.

72 Offense Level 17. Assumes MMP, 2-level abuse of trust.

73 Offense Level 20. Assumes fraud conviction (Base Offense Level 7), 2-level sophisticated means, 2-level abuse of trust.

74 Offense Level 21. Assumes fraud conviction (Base Offense Level 7), 10-level for loss greater than $120,000, 2-level sophisticated means, 2-level abuse of trust.

75 Offense Level 19. Assumes fraud conviction (Base Offense Level 7), 8-level for loss greater than $95,000 but less than $150,000, 2-level sophisticated means, 2-level abuse of trust.

76 Offense Level 21. Assumes MMP, 4-level aggravating role, 2-level vulnerable victim.

77 Offense Level 22. Assumes MMP, 4-level aggravating role, 2-level vulnerable victim.

78 Offense Level 24. Assumes MMP, 4-level aggravating role, 2-level vulnerable victim, 2-level mass marketing.

79 Offense Level 28. Assumes 4-level for more than 50 victims, 4-level aggravating role, 2-level vulnerable victim.

80 Offense Level 31. Assumes fraud conviction (Base Offense Level 7), 12-level for loss of greater than $200,000, 6-level for more than 250 victims, 4-level aggravating role, 2-level vulnerable victim.

81 Offense Level 28. Assumes fraud conviction (Base Offense Level 7), 12-level for loss of exactly $250,000, 3-level for more than 250 victims, 4-level aggravating role, 2-level vulnerable victim.

82 Offense Level 17. Assumes MMP, 2-level use of special skill.

83 Offense Level 19. Assumes MMP, 2-level use of special skill.

84 Offense Level 26. Assumes 2-level sophisticated means, 2-level access device/means of identification, 2-level for more than 10 victims, 2-level use of special skill.

85 Offense Level 29. Assumes fraud conviction (Base Offense Level 7), increase of 14-level for loss greater than $400,000, 2-level sophisticated means, 2-level access device/means of identification, 2-level for more than 10 victims, 2-level use of special skill.

86 Offense Level 26. Assumes fraud conviction (Base Offense Level 7), 12-level for loss greater than $250,000 but less than $550,000, 2-level sophisticated means, 2-level access device/means of identification, 1-level for more than 10 victims, 2-level use of special skill.

87 Offense Level 18. Assumes MMP, 2-level abuse of trust.

88 Offense Level 21. Assumes MMP, 2-level abuse of trust.

89 Offense Level 21. Assumes MMP, 2-level abuse of trust, 4-level endanger financial institution.

90 Offense Level 32. Assumes 2-level for more than 10 victims, 2-level sophisticated means, 4-level jeopardize financial institution, 2-level abuse of trust.

91 Offense Level 37. Assumes fraud conviction (Base Offense Level 7), increase of 16-level for loss, 2-level for more than 10 victims, 2-level sophisticated means, 4-level jeopardize financial institution, 4-level officer of publicly traded corporation, 2-level abuse of trust.

92 Offense Level 39. Assumes fraud conviction (Base Offense Level 7), 14-level for loss of more than $550,000 but less than $1.5 million, 6-level for substantial financial hardship to more than 25 persons [assuming loss of a job triggers the enhancement], 2level sophisticated means, 4-level jeopardize financial institution, 4-level officer of publicly traded corporation, 2-level abuse of trust.

93 Offense Level 25. Assumes MMP, 4-level aggravating role, 2-level abuse of trust.

94 Offense Level 29. Assumes MMP, 4-level aggravating role, 2-level abuse of trust.

95 Offense Level 34. Assumes 2-level sophisticated means, 4-level aggravating role, 2-level abuse of trust.

96 Offense Level 39. Assumes fraud conviction (Base Offense Level 7), 20-level for loss, 2-level sophisticated means, 4-level violation of securities law by officer of publicly traded corporation, 4-level aggravating role, 2-level abuse of trust.

97 Offense Level 42. Assumes fraud conviction (Base Offense Level 7), 20-level for loss of more than $9.5 million but less than $30 million, 2-level sophisticated means, 4-level violation of securities law by officer of publicly traded corporation, 3-level health care fraud greater than $7 million, 4-level aggravating role, 2-level abuse of trust.

98 Offense Level 25. Assumes MMP, 4-level aggravating role, 2-level abuse of trust.

99 Offense Level 32. Assumes MMP, 4-level aggravating role, 2-level abuse of trust.

100 Offense Level 34. Assumes MMP, 2-level sophisticated means, 4-level aggravating role, 2-level abuse of trust.

101 Offense Level 48. Assumes 4-level for more than 50 victims, 2-level sophisticated means, 4-level jeopardize soundness of financial institution (pension fund), 4-level aggravating role, 2-level abuse of trust.

102 Offense Level 59. Assumes fraud conviction (Base Offense Level 7), 30-level for loss, 6-level for more than 250 victims, 2-level sophisticated means, 4-level jeopardize soundness of financial institution (pension fund), 4-level violation of securities law by officer of publicly traded corporation, 4-level aggravating role, 2-level abuse of trust.

103 Offense Level 55. Assumes fraud conviction (Base Offense Level 7), 28-level for loss more than $300 million but less than $550 million, 6-level for substantial financial hardship to more than 25 persons, 2-level sophisticated means, 2-level jeopardize soundness of financial institution (pension fund) [would be 4 levels but for 8-level cap on combined victim number/financial hardship/soundness of financial institution], 4-level violation of securities law by officer of publicly traded corporation, 4-level aggravating role, 2-level abuse of trust.